468 F.2d 985
 In re TIDEWATER OIL COMPANY, Petitioning for Exoneration
from or Limitation of Liability, Third-Party
Plaintiff-Appellant,
Mrs. Betty Lee Brookshire Tyner, etc., et al., Plaintiffs,
v.
The TRAVELERS INSURANCE COMPANY, etc., Defendant,
H. B. "Buster" Hughes Co., Inc. and Employers' Mutual
Liability Insurance Company, Third-Party
Defendants-Appellees.
 No. 71-1691.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1972.
Rehearing Denied Nov. 7, 1972.
 
 Donald L. King, Herschel E. Richard, Jr., New Orleans, La., for appellant.
 Monte J. Ducote, Thomas B. Wheeler, New Orleans, La., for Hughes.
 Eldon E. Fallon, New Orleans, La., for Savoie.
 Before BELL, AINSWORTH and GODBOLD, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Hughes is in the business of performing construction and maintenance work for oil companies by contract and supplying labor to oil companies.[1] It entered into what is called a "Continuous Service Contract" with Tidewater, under which Hughes agreed "to furnish labor, transportation, tools and equipment for the performance of maintenance work on Tidewater Oil Company facilities as follows . . ." Attached were schedules of various categories of labor, and, for each category, the hourly rate to be paid Hughes for such labor, and like schedules of numerous items of equipment and the hourly rate for each item when furnished.
 
 
 2
 Pursuant to the contract, Hughes furnished Teddy Smith as a roustabout to do maintenance work required of Tidewater for its operation and management of an oil lease or leases in the Venice, Louisiana, oil field. Hughes furnished a supervisor or pusher for the maintenance crew. In this assignment Smith was not required to operate a boat.
 
 
 3
 Later Smith was transferred, apparently by Tidewater but with the knowledge and concurrence of Hughes, to the Bastian Bay field, also in Louisiana, where Smith began working as a switcher. A switcher checks pressure on wells, checks and changes charts on the meters of the wells, checks gauges, switches wells from discharging into one tank to discharging into another, and supervises discharge of oil from tanks to pipelines or barges. Hughes determined a new and higher rate for which Tidewater was to be billed for Smith's new duties, and began billing Tidewater at the higher rate and increased Smith accordingly. In his new duties Smith's hours were controlled by Tidewater, the performance of his duties was supervised by Tidewater, and he had no contact with other Hughes employees. Tidewater furnished him transportation to and from the job site. Tidewater could have Smith replaced if not satisfied with his work but could not discharge him. Smith would make out his time sheet showing hours worked, have it signed by Tidewater's representative, and mail it to Hughes. Hughes would use the data for billing Tidewater for Smith's services and for calculating the amount it (Hughes) owed Smith. Hughes made necessary deductions for unemployment insurance, old age benefits and workmen's compensation.
 
 
 4
 While Smith was operating a small motorboat owned, maintained and furnished to him by Tidewater for use in servicing its wells, and as a result of Smith's negligence, his boat collided with another small vessel, causing death to one person and injuries to another on the other vessel. When the collision occurred Smith was returning to the Tidewater tank battery after servicing a Tidewater well pursuant to instructions from his Tidewater supervisor. The claims which arose were settled, with Tidewater and its insurer advancing half of the funds and Hughes and its insurer advancing the other half, leaving as the only issue in this case indemnity as between Tidewater and Hughes. The District Court, 321 F.Supp. 14, granted indemnity to Hughes and denied indemnity to Tidewater. It found that Smith was a borrowed servant of Tidewater whose negligence was attributable to Tidewater.[2] The Hughes-Tidewater contract contained this important provision:
 
 
 5
 Contractor [Hughes] agrees to perform the work specified herein with due diligence according to Contractor's own method, Contractor being accountable to Tidewater only for the completed job. All persons furnished by Contractor in the performance hereunder shall be considered servants or agents of Contractor, and not of Tidewater, and Contractor shall be responsible as the employer of such persons under any applicable workmen's compensation, old age benefits, or unemployment insurance statutes and will fully comply with the employer's obligation under any such statutes.
 
 
 6
 Tidewater's position is that the emphasized language means just what it says, with the consequence, as between Hughes and Tidewater, that every person, including Smith, furnished to Tidewater by Hughes under the contract, remained an employee of Hughes with Hughes vicariously liable for his negligence, regardless of the presence of factual circumstances which otherwise might cause the person so furnished to become a borrowed servant of Tidewater. The District Judge rejected this theory on two grounds: (1) The emphasized language, read in context, expressed the intent that personnel furnished by Hughes remain employees of Hughes for only purposes of responsibility for workmen's compensation, old age benefits, and unemployment insurance, and if the intent was not unambiguously expressed any ambiguity must be resolved against Tidewater, the draftsman of the contract; (2) Though the first sentence of the quoted paragraph seemed to indicate that Hughes was to operate as an independent contractor, "being accountable to Tidewater for the completed job," Hughes, with respect to Smith, obviously was not an independent contractor since Smith was completely subject to Tidewater's control. Instead Smith was a borrowed servant.[3]
 
 
 7
 In addition, the court found Tidewater guilty of independent negligence in failing to supervise, control and instruct Smith, and in failing to insure that the vessel was under the control of a competent operator, thus rendering the vessel unseaworthy, which negligence and unseaworthiness were proximate causes of the collision.
 
 
 8
 We conclude that the District Court employed an erroneous legal standard and reverse. The contractual arrangements of concern are to be distinguished from the situation of the single or casual workman who regularly works for A but on the particular task is supervised by B, and the situation where the employees of X are working for the duration of a single job on the premises of Y. Hughes is in the business of supplying workmen by contract to Tidewater and other oil companies as and when required but on a continuing basis. Hughes, as a supplier of labor, may not desire to interpose itself so as to insulate Tidewater to any degree from vicarious liability imposed on Tidewater via the workmen supplied. Or, at the other extreme, Tidewater may desire to be wholly removed from such vicarious liability without regard to the legal niceties of the workmen's status, and Hughes may undertake to so insulate Tidewater. And, of course, there may be intermediate situations of partial insulation. "It [the indemnity agreement] might have been intended to mean [Hughes] as a supplier of labor and equipment undertook to indemnify against the consequences of [Smith's work as a contract switcher for Tidewater] without regard to [Smith's] precise legal status-employee, agent, servant, independent contractor, borrowed servant, or other capacity * * *." Warren Petroleum Corp. v. J. W. Green Contractors, 417 F.2d 242 (5th Cir. 1969). By its emphasis upon Smith's status as borrowed servant of Tidewater, and the lack of independent contractor status of Smith, the District Court in effect bypassed the question of whether the arrangement was intended to be independent of status and to relieve the regular user of contract labor from the very sort of argument over status which has arisen in this case. Tidewater, as user of contract labor, requires workmen of various trades and varying skills, to work under widely differing levels of supervision, and in numerous different physical situations. Traditional tests of employer-employee, independent contractor, and borrowed servant, if applied on a man-by-man, job-to-job basis, can produce wide variations and uncertainties regarding status. Neither law nor policy forbids the regular user of contract labor from requiring that, in the interest of certainty and uniformity, vicarious liability be on the supplier and the supplier fix his contract hiring rate accordingly and insure against it if he desires. Conversely, the parties may agree for vicarious liability to fall on the user. Insofar as the furnished workman is under traditional tests a borrowed servant, the allocation of ultimate responsibility can be in terms of indemnity or of the employee being treated as the servant of one party or the other.
 
 
 9
 The District Court construed the first quoted paragraph to be ambiguous and, by application of the canon of construction which thrusts the burden on the draftsman, concluded that supplied workmen are servants or agents of Hughes for only the purposes of workmen's compensation, old age benefits and unemployment insurance. It seems to us that the essential nature of supplying and using contract labor on a regular basis, the respective undertakings of Hughes and Tidewater to insure against vicarious liability for contract workmen, and the course of dealings between the two companies, are more central than the bare words of the short form agreement. Especially is this so where the supplying of labor has been of long duration between the parties. There are better keys to solution than whether "and not of Tidewater" is followed by a comma and an "and" or by a period and a new sentence.
 
 
 10
 In addition, the trial judge's construction, limiting the statement that furnished workmen are employees to only the extent of the specified matters (workmen's compensation, etc.) placed on Tidewater vicarious liability which otherwise would fall on Hughes. Not all furnished workmen are necessarily borrowed servants, so that under traditional standards Hughes may have a range of vicarious responsibility. But the court's construction did not remit the parties to respective liabilities as determined by status of the workmen under traditional tests. Rather, by limiting Hughes' agreed-upon responsibilities to the specified range it relieved Hughes of statusimposed liability and at least impliedly thrust it upon Tidewater. Assumption by the labor user of the supplier's area of vicarious liability is, while not impossible, at least surprising. If this is what the court concludes the parties really contracted for, there should be express findings to that effect.
 
 
 11
 With regard to the findings that Tidewater failed to supervise, control and inspect Smith in his duties, and failed to insure that the vessel was under the control of an operator, rendering it unseaworthy, the conclusion that these are "independent" breaches of duty by Tidewater assumes too much. Smith was furnished by Hughes as a contract switcher to perform his services at wells located in Bastian Bay and reached by a 30-minute boat ride. It may be that Hughes was obligated to furnish only a switcher who could effectively perform his duties when he reached the well, or, on the other hand, one who could also skillfully operate a boat to reach the site. While we do not purport to answer the question or imply an answer, at least arguably, in the water-borne transport world of the offshore oil industry, a switcher qualified to pilot his boat to the work site may be as much a fact of everyday life as a dry land switcher qualified to drive a pickup truck to the well. Whether Tidewater's actions visa-vis Smith's ability to operate the boat were "independent" depends upon whose duty it was to see to it that Smith was a qualified boat operator. We do not understand the finding of failure to "supervise and control" Smith in his duties to be any broader than in the sense of seeing to it that he was a competent boat operator. We do not understand it to be meant, or even contended, that Tidewater was obligated to have someone along to supervise Smith in the operation of the boat.
 
 
 12
 Reversed and remanded.
 
 
 
 [1]
 It engages in other types of business not pertinent to this case
 
 
 [2]
 Under Kiff v. Travelers Ins. Co., 402 F.2d 129, 131 (5th Cir. 1968) and Touchet v. Travelers Indemnity Co., 221 F.Supp. 376, 379 (W.D.La.1963)
 
 
 [3]
 The form contract in which this language appears is designed to cover either supplying workmen or performance of contract work as the case may be. On its face, the quoted language would seem to refer to the latter and not to the former