IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| DEAN WILCOX, ) | |
| ) | No. 32179-7-III |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| STEVE BASEHORE; BARTLETT ) | PUBLISHED OPINION |
| NUCLEAR, INC.; BARTLETT ) | |
| SERVICES, INC.; BARTLETT ) | |
| SUPPORT SERVICES, INC., ) | |
| ) | |
| Respondents. ) | |

FEARING, J. — Millwright Dean Wilcox, an employee of Washington Closure

Hanford (WCH), suffered serious injuries when he fell through an open hatch door on a

high scaffold while performing demolition work at "Building 336" at the Hanford site.

Wilcox contends that his fall resulted from the negligent design work or demolition work

plan of Stephen Basehore. On paper, Stephen Basehore was the employee of defendants

ELR Consulting, Inc. (ELR) or Bartlett Services, Inc. (Bartlett Services), if not both.

Nevertheless, if Basehore was a borrowed servant of WCH when preparing the work

plan, Wilcox's negligence claim against ELR and Bartlett Services fails. Also, if

Basehore was a borrowed servant of WCH, workers compensation bars Wilcox from

recovering against WCH because Basehore was a fellow servant. The trial court

dismissed ELR as a matter of law at the conclusion of trial. The trial court submitted the

borrowed servant issue and the question of Stephen Basehore's employment to the jury,

who found that Basehore was a borrowed servant of WCH.

On appeal, Dean Wilcox argues that, as a matter of law, Stephen Basehore was an

employee of Bartlett Services when he designed work on the scaffold. In turn, Wilcox

argues that, as a matter of law, Basehore was not a borrowed servant of WCH and the

trial court should not have submitted the question of Basehore's employer to the jury.

Settled law requires us to ignore savvy Hanford area contracts that declare Basehore to be

an employee of either or both ELR and Bartlett Services, rather than WCH, and to

address the practicalities of Stephen Basehore's employment. Since trial testimony

presented questions of fact as to who controlled Basehore's task of designing work

around the scaffold and, in turn, who functioned as Basehore's employer, we affirm the

trial court's submittal of the borrowed servant issue to the jury. We also affirm the

dismissal of ELR.

## FACTS

Our review of Dean Wilcox's assigned errors requires a perusal of contracts

between and among the United States Department of Energy (DOE), WCH, Bartlett

Services, ELR, and Stephen Basehore. This perusal provides insights into corporate

America, the nature of contracting with the federal government, and the substance of

2

work at the southeast Washington Hanford nuclear site. The perusal leads to a conclusion that many contract provisions written to gain government favor and to avoid state employment benefits law are a farce. Our review of Wilcox's designated errors also demands a focus on the nature of the tasks performed by Stephen Basehore and the circumstances leading to Wilcox's catastrophic fall and miraculous landing. Finally, the appeal requires we plumb the depth and breadth of the borrowed servant doctrine.

Our recitation of facts comes principally from the trial transcript. The Hanford nuclear reservation sits on 586 square miles of shrub and steppe desert in Benton County. Beginning in 1943, the American military used the remote site to produce plutonium for the atomic bomb dropped on Nagasaki, after which World War II ended. After a short lull, the United States government, in 1947, escalated nuclear weapon production at Hanford to wage the Cold War. Use of the Hanford site for weapons manufacture continued until 1987 when the last weapons grade reactor ceased operation. Weapon production processes left solid and liquid wastes that pose a risk to the local environment including the Columbia River. In 1989, the DOE, Environmental Protection Agency (EPA), and Washington State Department of Ecology entered into an accord to clean the Hanford site.

As part of the cleanup project, DOE contracted with WCH to decommission and demolish buildings at the Hanford nuclear site. One such building is Building 336, where Dean Wilcox sustained his injuries.

As part of its business practices, WCH supplements its permanent staff by "staff augmentation" when a temporary task needs completion. Report of Proceedings (RP) at 860. Since demolition work eventually ends, a demolition contractor wishes to limit its permanent staff. "Staff augmentation" consists of subcontracting with a firm, which, in turn, finds workers to perform jobs on a transitory basis. Staff augmentation helps to procure employees to fulfill temporary work tasks that may require a nationwide employment search. One WCH subcontract manager identified staff augmentation as a worker from another company working for WCH as if the worker belonged to WCH. WCH periodically entered multi-year subcontracts with staff augmentation firms. This appeal involves one such staff augmentation subcontractor, ELR.

ELR Consulting, Inc. is a small business formed in 2005 to provide temporary workers to other businesses. ELR qualifies, for purposes of federal government contracts, as a disabled military veteran owned small business. ELR's President Emmett Richards suffered a gunshot wound during the Vietnam War. According to Richards, the federal government requires that three percent of contract dollars go to disabled veteran small businesses. Under its contract with DOE, WCH received a fee incentive for subcontracting with small businesses and penalties if it did not. In addition to wishing to limit its permanent staff, WCH engaged in staff augmentation by subcontracts with firms such as ELR to fulfill contract requirements of dispensing sufficient contract funds to small businesses and to reap additional payment.

In 2007, WCH awarded ELR a staff augmentation subcontract. ELR did not always directly employ workers it provided WCH, but instead appropriated workers from other employment service companies, such as Bartlett Services, to send to WCH. If WCH desired the services of a particular person, ELR sometimes contracted with another employment firm for the services of that person, which services it then provided to WCH. ELR describes itself as a conduit for triggering federal benefits. In other words, WCH received a contract incentive payment by contracting with ELR to provide workers that ELR borrowed from other companies.

Bartlett Services is a Massachusetts corporation that boasts being the "Leading Provider of Technical & Professional Services" to contractors at DOE nuclear sites such as Hanford. Bartlett provides highly skilled professional workers that exercise independent judgment, including employees with expertise in demolition and decommissioning, known in the industry by the clever acronym, "D and D" work. Bartlett Services entered no contract with WCH. Nevertheless, through staff augmentation conduits such as ELR, about seventy Bartlett Services employees worked at the Hanford site, including performing tasks for WCH. Bartlett Services maintained a site coordinator, at Hanford, who responded to Hanford contractor employee needs. The coordinator did not supervise the work tasks of employees sent to work for other companies.

On occasion WCH identified in advance the worker whose temporary services it desired. In 2008, WCH sought the skills of Stephen Basehore, a Bartlett Services demolition and decommissioning "[w]ork [c]ontrol [p]lanner," to assist in prearranging the demolition of Building 336 at the Hanford site. RP at 66. Building 336, also known as the High Bay Testing Facility, was built in 1969 and housed experimental equipment for the study of sodium properties in support of the Hanford Fast Flux Test Facility. The building was 50 feet by 50 feet by 65 feet high. Building 336 never gathered nuclear contamination.

Pursuant to its subcontract with ELR, WCH contracted with ELR for Basehore's services. In turn, ELR procured the services of Basehore through his permanent employer, Bartlett Services. WCH paid $89.00 per hour for Basehore's services to ELR, which, in turn, paid Bartlett Services $85.58 per hour. Thus, ELR reaped $3.42 per hour for Basehore's services, for procuring Basehore from Bartlett Services and furnishing him to WCH.

WCH, ELR, Bartlett Services, and Stephen Basehore memorialized Basehore's work arrangement in various contracts: a "Technical Services Subcontract Agreement" between WCH and ELR (exhibit 34); Subcontract No: ELR-2008-008 between ELR and Bartlett Services (exhibit 222); and a WCH acknowledgement of employment status, benefits consent, and conflicts of interest form signed by Stephen Basehore (exhibit 5). On appeal, Dean Wilcox underscores provisions of the contracts. WCH and Bartlett

6

Services entered no direct contract.

The Technical Services Subcontract Agreement between WCH and ELR defined itself as "a Labor Hour Unit Rate type Subcontract" for technical services. Ex. 34 at ELR 000462. The Subcontract established the "**WORK TO BE PERFORMED**" as:

> Except as specified elsewhere in this SUBCONTRACT, [ELR] shall furnish all professional services including any labor, materials, tools and supplies, equipment, transportation, supervision, and shall perform all operations necessary and required to satisfactorily provide the **Services of Steve Basehore** as fully described in Exhibit "D" and other documents attached.

Ex. 34 at ELR 000462 (emphasis in original).

The Technical Services Subcontract Agreement identified four exhibits: exhibit A, general conditions; exhibit B, special conditions; exhibit C, quantities, prices and data; and exhibit D, scope of work. General condition 2 (GC-2) described ELR as an independent contractor and directed it to control its employees:

> [ELR] shall act as an independent contractor and not as the agent of [WCH] in performing this Subcontract, *maintaining complete control over its employees* and all of its lower-tier suppliers and subcontractors. . . . . [ELR] shall perform the Work hereunder in accordance with its own methods subject to compliance with the Subcontract.

Ex. 34 at ELR 000466 (emphasis added). General condition 19 of the subcontract required ELR to indemnify WCH for

> any act, omission, fault or negligence whether active or passive of [ELR], its lower-tier suppliers, subcontractors or of anyone acting under its direction or control or on its behalf in connection with or incidental to the performance of this Subcontract.

7

No. 32179-7-III
*Wilcox v. Basehore*

Ex. 34 at ELR 000470.

General conditions 5 and 6 of the Technical Services Subcontract Agreement between ELR and WCH established rules of contract interpretation. Under general condition 6, special conditions took precedence over general conditions. Ex. 34 at ELR 000466-67. Special condition 13 (SC-13 B) of the subcontract assigned responsibility to WCH Senior Project Engineer Kim Koegler for the technical aspects of Stephen Basehore's work:

> [WCH] has designated as Subcontract Technical Representative (STR), Kim Koegler, who will be responsible for the technical aspects of the performance of the Subcontract. The STR may designate other personnel to oversee the performance of the Work, sign field tickets, etc. However, the designated STR retains ultimate authority over the technical aspects of the Work. Should [ELR] and STR disagree over the technical requirements of the Subcontract, such matters will be immediately referred to the [WCH]'s Subcontract Administrator for resolution. The STR does not possess authority, express or implied, to direct [ELR] to deviate from the terms and conditions of the Subcontract.

Ex. 34 at ELR 000486. Under the heading "**INDEPENDENT CONTRACTOR**," special condition 14 (SC-14) provided:

> [ELR] realizes that any and all employees provided by [ELR] under this agreement are not Employees of Washington Closure Hanford, LLC or the Department of Energy. [ELR] is solely responsible for any and all required taxes, insurance and liabilities arising under the performance of this subcontract by its employees.

Ex. 34 at ELR 000486. The WCH-ELR contract included a blank copy of WCH's "ACKNOWLEDGEMENT OF EMPLOYMENT STATUS" form. Ex. 34 at ELR

8

000500.

To fulfill its obligations to WCH, ELR contracted with Bartlett Services for Stephen Basehore's services. Under "SCOPE OF WORK," the agreement between Bartlett Services and ELR read:

> [Bartlett Services] shall furnish the services set forth herein and shall perform such services as an independent contractor and <u>not</u> as an employee of [ELR].
>
> Provide the services of Mr. Steve Basehore as a Work Control Planner as a subcontractor to ELR Consulting, Inc. [Bartlett Services] will be responsible for the employment and other employee related services required to maintain this individual on the project, including any required training.

Ex. 222 at 1. The contract burdened Bartlett Services with payment of state and federal taxes for the employment of Basehore. The contract incorporated by reference exhibits A and B of the WCH-ELR subcontract and demanded that Bartlett Services obtain Basehore's signature on WCH's acknowledgement of employment status form.

On May 27, 2008, Stephen Basehore completed and signed WCH's "ACKNOWLEDGEMENT OF EMPLOYMENT STATUS" form. Ex. 5. The completed form read, in part:

> I, STEPHEN P BASEHORE, have been advised, and hereby acknowledge that, during the period that I am serving as a subcontractor to Washington Closure Hanford, LLC, I shall remain an employee of BARTLETT SERVICES, INC. for purposes of payment of any and all wages, salaries, and benefits, including, but not limited to, paid absences, non-executive bonuses, medical and dental benefits, pension, 401(k) plans, life insurance, flexible spending, severance benefits, and all retirement benefits.

9

. . . .

> Additionally, I understand and agree that BARTLETT SERVICES, INC. is solely responsible for my workers' compensation coverage and any and all applicable taxes - local, state, and federal. Accordingly, I agree and acknowledge that BARTLETT SERVICES, INC. is my sole and exclusive employer and as such is solely and exclusively responsible for payment of any of the foregoing and that I have no legal recourse or rights against Washington Closure Hanford for such payments. I further agree that my employment with and compensation paid by BARTLETT SERVICES, INC. is sufficient consideration for this consent and agreement.

Ex. 5. Dean Wilcox, as an employee of WCH, had no knowledge of the various agreements among WCH, ELR, Bartlett Services, and Stephen Basehore.

Consistent with the three agreements, Bartlett Services deemed Stephen Basehore its salaried employee and paid him $58.71 per hour. Bartlett Services afforded Basehore paid vacation and health and dental benefits. Bartlett Services included Basehore as its employee when reporting to government agencies.

As WCH's employee, Stephen Basehore was subject to the company's employee handbook and safety manual. Bartlett Services' president testified that Basehore, like other employees, also needed to abide by Bartlett Services' safety program. The president also declared that, with respect to safety, Bartlett Services does not relinquish exclusive control over an employee when he or she provides services to another entity. Nevertheless, Bartlett Services, Inc.'s safety plans did not apply to Stephen Basehore when working for WCH at Building 336. Since DOE provided a comprehensive site-specific safety plan, under Bartlett Services' policy, its own safety plan did not apply.

Bartlett Services expected its employees to follow the client's "policies, rules, regulations or guidelines." Ex. 46 at 2.

WCH contracted for Stephen Basehore's services as a "[w]ork [c]ontrol [p]lanner." RP at 66. A work control planner prepares a "Job Hazard Analysis," which identifies risks and hazards for a given project. Other experts provide safety suggestions to the work planner, who then develops a protocol to perform tasks in a safe sequence. The work control planner also assembles instructions into an Integrated Work Control Package (IWCP), or work package for short. Federal law demands the preparation of work package for demolition projects on DOE sites. The work package includes instructions for discrete tasks, drawings, technical guides, permits, and approvals necessary to safely accomplish demolition work activity. Task instructions seek to create a safe work environment. The record does not detail whether a work package incorporates the Job Hazard Analysis or if the analysis is a separate document. Dean Wilcox claims Basehore negligently prepared the work package on the Building 336 demolition project.

According to Bartlett Services' vice president of human resources, the position of work control planner demands unique knowledge, skills, and training. The job exacts the exercise of independent judgment and discretion. The demolition field suffers a shortage of work control planners because of the extensive training required.

WCH assigns a project director to a demolition project. The director designates a

"[r]esponsible [m]anager" and ensures proper training of this manager. Ex. 1 at 4. The responsible manager selects the planning team, which consists of subject matter experts, engineers, and workers. A responsible manager reviews and approves all work packages and Job Hazard Analyses. The work package, in part, defines the roles and responsibilities of WCH managers and workers assigned to the demolition project.

WCH employees filled all the roles, mentioned in the preceding paragraph, for the Building 336 demolition undertaking. WCH's Dan Elkins served as project director. Both Elkins and WCH's Thomas Kisenwether served as responsible managers. WCH's Donna Yasek served as project engineer, and WCH's Jim Evans served as the safety subject matter expert. WCH's Brad Schilperoort served as field work supervisor, and WCH's Kim Koegler served as senior project engineer.

Under the Building 336 work package, the responsible manager supervised the work control planner, Stephen Basehore. The responsible manager retained authority over approval of Basehore's work package. If Basehore believed a tabletop discussion, rather than an examination of the work area, sufficed for finalization of the Job Hazard Analysis, Basehore needed approval from the responsible manager. The responsible manager could request that Basehore revise the work package.

WCH utilizes two varieties of work packages: Type I for single engagement tasks, and Type II for repeated tasks. The responsible manager determines which type will be used for various tasks.

12

As previously mentioned, Technical Services Subcontract Agreement special condition 13 designated WCH's Kim Koegler as responsible for the technical aspects of Basehore's work. The subcontract also allowed Koegler to designate other WCH personnel to oversee Basehore. Koegler delegated the supervision of Basehore to engineer WCH's Donna Yasek, who supervised and directed Basehore on a daily basis. Yasek reviewed Basehore's work package before review by responsible managers Kisenwether and Elkins.

No contract term directed Bartlett Services or ELR to supervise or direct the technical aspects of Stephen Basehore's work. No Bartlett Services or ELR manager actually supervised or controlled Basehore's technical work on the work package. WCH did not expect ELR or Bartlett Services to supervise Basehore's work performance.

Stephen Basehore initially assembled a Type II work package for Building 336 because WCH anticipated standard demolition processes. Demolition usually entails severing a building's supports from top to bottom. A crane operator expressed concern, however, that standard demolition practices might cause the structure to pivot outward and fall on him. So, WCH changed the work package to a Type I package.

The Type I work package prepared by Stephen Basehore required workers to ascend a ladder 50 feet to a scaffold or catwalk in order to remove the track stops for a bridge crane. The catwalk caused Dean Wilcox's injuries. A bridge crane, also called an overhead crane, is a stationary crane attached to the ceiling of an industrial building. The

13

overhead crane consists of parallel runways or tracks with a traveling bridge spanning the gap. A hoist, the lifting component of the crane, travels along the bridge.

Before the change from a Type II to Type I work plan, WCH's project director and responsible manager Dan Elkins rated the Building 336 demolition project as low risk and indicated that no work would be performed on elevated surfaces. WCH's change to the Type I work plan entailed the performance of a Job Hazard Analysis site review, called a walkdown. As the work control planner, Stephen Basehore led walkdowns of Building 336 on June 15 and 25, 2009. Basehore inspected the catwalk from the ground, but did not ascend the ladder to the catwalk because a climbing carabiner could not be found. Basehore assumed stanchions and chains guarded the ladder's opening to the catwalk. Basehore did not know that the ladder accessed the catwalk through a hinged hatch.

Stephen Basehore lacked knowledge of all work to be performed on the catwalk, so his work package did not include instructions for all tasks on the high walk. Because he never ascended to the catwalk, Basehore did not know the scaffold's configuration. Basehore failed to recognize the risks of falling presented by work on the catwalk.

Stephen Basehore planned for workers to use safety harnesses and lanyards connected to the ladder to safely ascend to and descend from the catwalk. Basehore did not know that the lanyard would route through an open hatch. On June 30, 2009, WCH's Thomas Kisenwether approved Basehore's work package for Building 336 and work on

14

the demolition project began that day.

On July 1, 2009, four workers, two riggers and two millwrights including Dean Wilcox, ascended the ladder to the catwalk. A rigger specializes in moving large and heavy objects. A millwright is a craftsman engaged in the erection or disassembly of machinery. The millwrights intended to pull gear boxes and unlock brakes on the bridge crane. WCH's field supervisor Brad Schilperoort chose Wilcox as a millwright member of the crew because he had prior experience in this task. Schilperoort directed the four workers to ascend at one time, close the catwalk hatch, perform their work, and descend together after reopening the hatch.

The four workers ascended to the catwalk and performed their tasks. One of the riggers descended from the catwalk to replace the ground support rigger who left to obtain materials. One of the three remaining workers on the catwalk closed the hatch cover behind the descending rigger. When the remaining three workers believed they were finished with the job, the other millwright descended the ladder and left the hatch open believing the other two workers, including Dean Wilcox, would immediately follow. During this time, the ground support rigger returned and called to direct one additional task of the crew on the catwalk. The ground rigger asked that the two scaffolded workers secure the crane trolley to the bridge with chains and tensioners. Wilcox and the catwalk rigger concluded that the safest method to apply the chains would be moving the crane closer to them by pushing the crane wheels from both ends of the

15

crane bridge. As Wilcox ambled toward the west end of the catwalk, he did not notice the open hatch, stepped into it, and fell fifty feet to the concrete floor below.

During his fall, Dean Wilcox struck a midpoint platform twenty-five feet below the catwalk and then fell another twenty-five feet to the concrete floor. He survived the fall, but cracked two vertebrae in his back, broke bones in both legs, and damaged his left knee. He suffered no head or other internal injuries.

## PROCEDURE

Dean Wilcox filed suit against Steve Basehore, Bartlett Services, and ELR for negligence. Wilcox claimed that Basehore did not employ reasonable care when preparing the work plan. Wilcox did not join WCH as a defendant since WCH was his employer, who enjoyed worker compensation immunity. Bartlett Services answered, in part, by alleging Stephen Basehore was the borrowed servant of WCH and thus Bartlett Services incurred no liability for any negligence of Basehore. ELR answered that it was not liable because at no relevant time was Stephen Basehore employed by or acting as an agent or borrowed servant of ELR. At Dean Wilcox's request, the trial court dismissed all claims against Stephen Basehore.

The case went to trial over two weeks. After all parties rested, Dean Wilcox moved to dismiss ELR's affirmative defense that Stephen Basehore acted as WCH's borrowed servant. Wilcox argued that, since ELR admitted that Basehore was never its employee, the borrowed servant doctrine does not benefit ELR. In response, ELR moved

for a directed verdict. ELR argued that Basehore was neither its employee nor did it exercise any control over Basehore for purposes of the borrowed servant doctrine. In opposition, Wilcox emphasized contractual provisions declaring Stephen Basehore to be an employee of ELR and appointing ELR as an independent contractor. The trial court granted ELR's motion.

Perhaps encouraged by ELR's success, Bartlett Services also moved the trial court for a directed verdict. Bartlett Services argued that the evidence showed it held no control over the work of Stephen Basehore and that WCH exercised exclusive control over Basehore's tasks. The trial court denied the motion, commenting: "There is more than ample evidence here that Mr. Basehore was an employee of Bartlett. He was subject to their safety manual. He was subject to the employee manual." RP at 935.

Dean Wilcox objected to jury instructions 12 and 13 and the special verdict form that outlaid Bartlett Services' borrowed servant defense. Wilcox did not object to the language within the two jury instructions but contended that no instruction addressing the borrowed servant doctrine should be given because Bartlett Services could not rely on the doctrine as a matter of law.

The trial court tendered a verdict form to the jury, which began:

SPECIAL VERDICT FORM

**QUESTION NO. 1:**

17

**Do you find that Steve Basehore was a borrowed servant of Washington Closure Hanford?**

*(Answer "yes" or "no".)*

**ANSWER:** Yes _____       No _____

*(DIRECTION: If you answered "Yes" to Question No. 1 sign this verdict form and notify the bailiff. If you answered "No" to Question No. 1, proceed to Question No. 2)*

Clerk's Papers at 116. The jury answered yes to question no. 1. Thus, the jury did not decide whether Stephen Basehore failed to exercise reasonable care when preparing the Building 336 work package. Based on the jury's finding, the trial court entered judgment in favor of Bartlett Services.

## LAW AND ANALYSIS

On appeal, Dean Wilcox contends the trial court erred when it: (1) granted ELR a directed verdict, and (2) instructed the jury on the borrowed servant defense. Each assignment of error exacts an examination of the borrowed servant doctrine or defense. With his first assignment of error, Wilcox contends an issue of fact as to the application of the borrowed servant doctrine precluded a grant of judgment as a matter of law to ELR. With his second assignment of error, Wilcox claims he was entitled to judgment as a matter of law against Bartlett Services because no issue of fact arose during trial to permit the application of the borrowed servant doctrine in favor of Bartlett Services. Wilcox's request for judgment against Bartlett Services subsumes his objections to the

18

two jury instructions and the verdict form. We address the liability of Bartlett Services first.

## Bartlett Services

The parties do not dispute who employed Dean Wilcox. WCH employed Wilcox. The wrangle below was and on appeal is who employed Stephen Basehore such that the entity, other than WCH, could become vicariously liable for any negligent design work of Basehore. The borrowed servant doctrine controls the question of who employed Basehore.

Case law characterizes the borrowed servant doctrine as an exception to respondeat superior or vicarious liability, but the doctrine may also be considered an extension of respondeat superior. The loaned servant doctrine can be used to avoid or impose liability. The general or permanent employer may claim that it is not liable for the acts of an employee, because it loaned the employee to another. An injured party may argue that a special or temporary employer is liable for the acts of a borrowed negligent employee. On appeal, Bartlett Services, Stephen Basehore's general employer, invokes the doctrine to avoid liability.

The parties may assume that, if Stephen Basehore is the borrowed servant of WCH, Bartlett Services automatically avoids liability because Basehore is then not the employee of Bartlett Services for purposes of vicarious liability. The special verdict form assumed that Basehore could not be both the employee of WCH and Bartlett Services

when performing the alleged negligent design work, since the verdict form directed the jury to end its consideration of liability of Bartlett Services if it found Basehore to be the borrowed servant of WCH. A worker can remain an employee of the general employer while also becoming a borrowed servant of the special employer, but reported decisions impliedly shun a finding of two employers for purposes of vicarious liability because both employers do not simultaneously control the negligent worker's task that led to a plaintiff's injuries. We might envision a situation where the general employer and special employer retain some control over a worker's particular task, but Dean Wilcox does not contend that an entity other than WCH controlled in the field the preparation of the work package by Stephen Basehore. Therefore, we follow the general rule that when the servant has borrowed servant status at the time of performance of the relevant transaction, the servant's general employer can escape liability for damage or injuries flowing from the transaction. *Stocker v. Shell Oil Co.*, 105 Wn.2d 546, 548, 716 P.2d 306 (1986).

Dean Wilcox contends that the borrowed servant doctrine does not apply to label Stephen Basehore as WCH's employee or to shed Bartlett Services' status as the employer for vicarious liability purposes for six reasons. First, under the contracts among WCH, ELR, Bartlett Services, and Stephen Basehore, Bartlett Services retained control over the work of Basehore, conceded an employment relationship with Basehore, and agreed to be vicariously liable for Basehore's conduct. Second, the various parties

were independent contractors and the borrowed servant doctrine does not apply when the potential employers are independent contractors. Third, the duty to indemnify WCH found in contract language trumps the borrowed servant doctrine. Fourth, the present circumstances are unique in that Stephen Basehore underwent a transfer from employer one to employer two and from employer two to employer three, rather than from one general employer to one special employer. Thus, Wilcox contends, the borrowed servant rule does not apply in a situation involving two conveyances of the purported negligent employee. Fifth, the borrowed servant doctrine does not apply when the servant is a professional, rather than a common laborer. Sixth, ELR, Bartlett Services, and WCH engaged in phony contracts in order to gain payments or avoid penalties under WCH's contract with the United States government and, as a matter of public policy, the court should strictly apply contractual language to penalize ELR and Bartlett Services for their counterfeit contracts. Three of the arguments conflate since Wilcox's independent contractor and indemnification arguments are based on contract language. The numerous arguments prolong our opinion.

Dean Wilcox's arguments, while understandable, have not been recognized or accepted by any court. We follow precedent that focuses on the realities of the situation, not the language of contracts. We follow case law that demands that the borrowed servant doctrine be applied when the special employer controls and supervises the tasks performed by the worker. Since trial testimony supported a conclusion that WCH, not

Bartlett Services, controlled the performance of Stephen Basehore when he prepared the work package, the trial court did not err by allowing the jury to find that Stephen Basehore was a borrowed servant of WCH.

Under the rule of respondeat superior, an employer is vicariously liable to third parties for his servant's torts committed within the scope of employment. *Stocker v. Shell Oil Co.*, 105 Wn.2d at 548 (1986). An employer, however, may loan his servant to another employer. *Stocker*, 105 Wn.2d at 548. When a servant's general employer loans his servant to the borrowing, or "special" employer, the servant then becomes the "borrowed servant" of the special employer to perform a particular transaction. *Stocker*, 105 Wn.2d at 548. If it can be established that the servant had borrowed servant status at the time of performance of such transaction, the servant's general employer can escape liability for damage or injuries flowing from the transaction. *Stocker*, 105 Wn.2d at 548; *Brown v. Labor Ready Nw., Inc.*, 113 Wn. App. 643, 647, 54 P.3d 166 (2002).

An employee may become the loaned servant of another by submitting himself to the direction and control of the other with respect to a particular transaction or piece of work. *Fisher v. Seattle*, 62 Wn.2d 800, 805, 384 P.2d 852 (1963); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 121, 847 P.2d 945 (1993). In circumstances when the borrowed servant is also the plaintiff, a question of whether the servant consented to being borrowed arises. *Brown v. Labor Ready Nw., Inc.*, 113 Wn. App. at 649. But when, as here, the plaintiff is not the allegedly borrowed servant, consent is not an issue. The issue

22

becomes whether the borrowing employer accepted and controlled the service that led to the injury. *Brown*, 113 Wn. App. at 649.

In order for the loaned servant doctrine to apply, the borrower must have exclusive control over the employee. *Am. Sign & Indicator Corp. v. State*, 93 Wn.2d 427, 434, 610 P.2d 353 (1980); *Ackerman v. Terpsma*, 74 Wn.2d 209, 212, 445 P.2d 19 (1968). An employee may become the other's servant as to some acts and not as to others. *Nyman v. MacRae Bros. Constr. Co.*, 69 Wn.2d 285, 288, 418 P.2d 253 (1966); *see also* RESTATEMENT (SECOND) OF AGENCY § 227. Exclusive control for all purposes is not required, rather the question is the control of the borrowed servant by the borrowing employer for the transaction causing injury. *Brown*, 113 Wn. App. at 651. This rule is reasonable since the employer most responsible for the work that causes the plaintiff injury should be the liable employer. A related determining factor for the borrowed servant doctrine is whose work is being performed. *Pearson v. Arlington Dock Co.*, 111 Wash. 14, 22, 189 P. 559 (1920). The trier of fact should consider the work being performed at the time of the accident and its relationship to the business of the special employer and general employer. *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 257, 386 P.2d 958 (1963).

Whether the borrowing employer exercised exclusive control over the borrowed servant for the transaction that caused the injury is typically a question of fact for the jury. *Nyman v. MacRae Bros. Constr. Co.*, 69 Wn.2d at 288; *Davis v. Early Const. Co.*,

63 Wn.2d at 257; *Campbell v. State*, 129 Wn. App. 10, 21, 118 P.3d 888 (2005). When there is conflicting evidence, the question is one of fact to be decided by the trier of facts. *Anderson v. Red & White Constr. Co.*, 4 Wn. App. 534, 539, 483 P.2d 124 (1971). Only when the evidence is undisputed does the nature of the relationship existing present a question of law. *Pichler v. Pac. Mech. Constructors*, 1 Wn. App. 447, 450, 462 P.2d 960 (1969).

Dean Wilcox faults Stephen Basehore and the Building 336 work package he assembled for causing his fall. Thus, when addressing Wilcox's assignments of error, we must determine if some facts showed that WCH exercised exclusive control over Stephen Basehore's creation of the work package. Many facts evidenced exclusive control in WCH. Basehore submitted the work package for approval to the demolition project's responsible manager, an employee of WCH. Under WCH's IWCP, the responsible manager supervised Basehore's performance as the work control planner. The responsible manager could demand that Basehore revise his work package. The WCH-ELR Technical Services Subcontract Agreement special condition 13 designated Kim Koegler, an employee of WCH, as responsible for the technical aspects of Basehore's work. The subcontract allowed Koegler to designate other personnel to oversee Basehore. Koegler delegated the supervision of Basehore to WCH engineer Donna Yasek, who supervised and directed Basehore on a daily basis. No trial testimony suggested that any employee or manager of Bartlett Services oversaw or controlled

24

Stephen Basehore's preparation of the work package deemed defective by Dean Wilcox.

Dean Wilcox argues that WCH, ELR, Bartlett Services, and Stephen Basehore's various contracts preclude a borrowed servant defense on three grounds: (1) Wilcox remained Bartlett Services' employee, (2) ELR, Bartlett Services, and Basehore were independent contractors, and (3) ELR promised to indemnify WCH. Since Bartlett Services had no direct contract with WCH, Wilcox may rely, in part, on the provision in the agreement between Bartlett Services and ELR that bound Bartlett Services to the contract between ELR and WCH.

The subcontract between ELR and WCH declared that all employees provided by ELR under the agreement, which included Stephen Basehore, "are not Employees of Washington Closure Hanford, LLC or the Department of Energy." Ex. 34 at ELR 000486. Also, a provision in the ELR subcontract read that ELR would *"maintain[ ] complete control over its employees* and all of its lower-tier suppliers and subcontractors. . . . [ELR] shall perform the Work hereunder in accordance with its own methods subject to compliance with the Subcontract." Ex. 34 at ELR 000466 (emphasis added). Therefore, Wilcox reasonably argues that Basehore could not be a borrowed servant of WCH. Wilcox contends the sophisticated parties could and did contract to remove the employment of Stephen Basehore outside the common law borrowed servant rule.

In support of his contention, Dean Wilcox forwards no law that supports his argument that provisions in a contract prevail over the realities of the work site. Wilcox's

25

argument also fails to acknowledge that the borrowed servant doctrine assumes that the negligent worker remains in the general employ of one employer who is not vicariously liable and that general employer may still claim the loaned servant is another's employee for a particular task. Stephen Basehore could be a borrowed employee of WCH for one purpose and the employee of Bartlett Services for another purpose. The subcontract between ELR and WCH may refer only to general employment or employment for purposes of wages and benefits and not specific or special employment of a task.

Dean Wilcox also relies on testimony of Bartlett Services' president that Bartlett did not relinquish exclusive control over Stephen Basehore's safety. Wilcox contends this admission negates the "exclusive control" element of the borrowed servant doctrine. This argument ignores the fact that DOE and WCH rules controlled safety at the Building 336 worksite. Also the gist of the doctrine is that the special employer controls the tasks performed by the employee, not the employee's safety.

Dean Wilcox's appeal ignores a contractual provision that harms his legal position. Special condition 13 (SC-13) of the Technical Services Subcontract Agreement between WCH and ELR assigned responsibility to WCH Senior Project Engineer Kim Koegler for the technical aspects of Stephen Basehore's work. The ELR subcontract special conditions prevailed over the subcontract's general conditions, a practice common to construction contracts.

*Brown v. Labor Ready Northwest, Inc.*, 113 Wn. App. 643 (2002) demolishes Dean Wilcox's argument that the contracts between the employing entities control over the underpinnings of the borrowed servant rule. In that case, Joyce Brown, an employee of CMI Northwest, suffered injuries as the result of the operation of a forklift by Russell Henson, a worker sent to CMI by Labor Ready, a labor agency. Brown sought to impose liability on Labor Ready as the general employer of the forklift operator. Summary judgment in favor of Labor Ready was affirmed on appeal, since CMI controlled the forklift operations of Henson. On appeal, Brown emphasized the agreement between Henson and CMI, which read that Henson was not an employee of Labor Ready's customer and that Labor Ready would pay worker compensation premiums for Henson. Brown unsuccessfully argued that the contractual language rendered Labor Ready the employer of Henson and imposed liability on Labor Ready for negligent acts of Henson. The decision illustrates the unimportance of contractual terms in determining employment for purposes of liability for injuries caused by a worker.

Dean Wilcox argues Bartlett Services, ELR, and Stephen Basehore's status as independent contractors precludes the borrowed servant defense. The subcontract between WCH and ELR declared ELR to "act as an independent contractor and not as the agent of [WCH] in performing this Subcontract." Ex. 34 at ELR 000466. Under the agreement between Bartlett Services and ELR, Bartlett Services provided the services of Stephen Basehore as a work control planner as a subcontractor to ELR. In turn, Basehore

signed an acknowledgment that he served as a "subcontractor to Washington Closure Hanford, LLC." Ex. 5. Wilcox may consider a subcontractor to be synonymous with an independent contractor.

In support of his independent contractor argument, Wilcox cites *Hartell v. T.H. Simonson & Son Company*, 218 N.Y. 345, 113 N.E. 255 (1916). In *Hartell*, a large lumber truck driven by a Durr employee collided with a wagon operated by Edward Hartell, resulting in the death of Hartell. Simonson & Son Company owned the truck and its cargo of lumber and had hired Durr to cart lumber with Durr's employee and Durr's team of horses. Simonson paid a rate per day to Durr, who paid his employees by the hour. At issue was whether Simonson became liable under the borrowed servant doctrine.

The New York court, in *Hartell*, expressed a general rule and an exception for independent contractors:

> A servant in the general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, who is liable for his negligence. But if the general employer enters into a contract to do the work of another, as an independent contractor, his servants do not become the servants of the person with whom he thus contracts, and the latter is not liable for their negligence.

*Hartell*, 218 N.Y. at 349. The *Hartell* court reasoned that Durr, the truckman, did not stand in the relation of an independent contractor to Simonson because he did not undertake to deliver lumber for the latter. Durr simply furnished a team and driver to

28

enable Simonson to do its own work. Thus, the New York court did not apply any independent contractor exception.

Dean Wilcox urges this court to apply *Hartell*'s exception for independent contractors given the contracts between WCH, ELR, Bartlett Services, and Stephen Basehore. Nevertheless, for the exception to operate, the general employer must undertake to do the work of another. *Hartell*, 218 N.Y. at 350. Bartlett Services did not undertake WCH's work. WCH did not contract ELR or Bartlett Services to undertake its demolition of Building 336 or the creation of the work package. Instead, WCH contracted for "the **Services of Steve Basehore**." Ex. 34 at ELR 000462 (emphasis in original).

Dean Wilcox next argues that ELR's promise to indemnify WCH for Stephen Basehore's negligence precludes the borrowed servant defense. The WCH-ELR contract required ELR to indemnify WCH for "any act, omission, fault or negligence whether active or passive of [ELR], its lower-tier suppliers, subcontractors or of anyone acting under its direction or control or on its behalf in connection with or incidental to the performance of this Subcontract." Ex. 34 at ELR 000470.

Before addressing the merits of Wilcox's argument, we must address a procedural objection raised by Bartlett Services. Bartlett Services argues that Wilcox failed to preserve this indemnity language argument for appeal. Wilcox vehemently objected to the trial court's instructing the jury on the borrowed servant defense and often

29

emphasized the underlying contractual relationships. The record does not show Wilcox having identified the indemnity clause to support its objection.

Generally, failure to raise an issue before the trial court precludes a party from raising it on appeal. *Lunsford v. Saberhagen Holdings, Inc.*, 139 Wn. App. 334, 338, 160 P.3d 1089 (2007), *aff'd*, 166 Wn.2d 264, 208 P.3d 1092 (2009); RAP 2.5. But when the issue raised for the first time on appeal is arguably related to issues raised in the trial court, a court may exercise its discretion to consider newly articulated theories for the first time on appeal. *Lunsford*, 139 Wn. App. at 338. We apply this exception here. Dean Wilcox's reliance on the indemnity language is closely related to his arguments that other contract language precludes application of the borrowed servant doctrine. Bartlett Services suffers no prejudice from our entertaining the argument.

In support of his argument that indemnity language precludes a borrowed servant defense, Wilcox cites to *Stocker v. Shell Oil Company*, 105 Wn.2d 546, 548, 716 P.2d 306 (1986) and *Tidewater Oil Company v. Travelers Insurance Company*, 468 F.2d 985 (5th Cir. 1972). Neither case precludes instructing the jury on a borrowed servant defense in a case where the injured party, rather than a contracting party, seeks recovery.

In *Stocker v. Shell Oil Company*, the Washington Supreme Court defined the issue before it as: "whether the borrowed servant status of a negligent worker, assigned pursuant to a contract between a labor supplier and a labor user, may defeat an express indemnity agreement *between the contracting parties*." 105 Wn.2d at 546-47 (emphasis

30

added). The court held that an express contractual agreement for indemnification must prevail over the tort defense of borrowed servant. *Stocker* stands for the proposition that contracting parties may allocate the risk of such liability as they see fit: "Indemnity agreements are essentially agreements for contractual contribution, whereby one tortfeasor, against whom damages in favor of an injured party have been assessed, may look to another for reimbursement." *Stocker*, 105 Wn.2d at 549. Under *Stocker*, the borrowed servant doctrine might still operate to assess fault and liability in favor of the injured party. But when parties have allocated the financial risk for such liability in contract, the doctrine cannot serve to reallocate that risk.

ELR's duty to indemnify WCH would be relevant in a suit brought by WCH for indemnification against ELR. The duty holds no importance in a negligence suit brought by Dean Wilcox against ELR or Bartlett Services. ELR, and indirectly Bartlett Services, agreed to indemnify WCH, not Wilcox.

*Tidewater Oil Company* is no more helpful to Dean Wilcox. There, Hughes Company employed Teddy Smith, paid his wages, and made necessary deductions for unemployment insurance, old age benefits, and worker compensation. Tidewater Oil contracted for Hughes Company to provide labor, transportation, tools, and equipment for the performance of maintenance work on Tidewater facilities. The contract provided, "All persons furnished by [Hughes] in the performance hereunder shall be considered servants or agents of [Hughes], and not of Tidewater." 468 F.2d at 987. Hughes

31

furnished Teddy Smith to Tidewater to work as a roustabout and then switcher.

Tidewater oversaw and controlled Smith's work. As a result of Smith's negligence, a

boat of Tidewater's collided with a small vessel, killing one person and injuring another.

After claims were settled, Tidewater sought indemnification from its insurance company.

The trial court denied indemnification, because Smith was a borrowed servant of

Tidewater whose negligence was attributable to Tidewater.

In *Tidewater Oil*, the Fifth Circuit United State Court of Appeals reversed the trial

court, writing:

> By its emphasis upon Smith's status as borrowed servant of
> Tidewater, and the lack of independent contractor status of Smith, the
> District Court in effect bypassed the question of whether the arrangement
> was intended to be independent of status and to relieve the regular user of
> contract labor from the very sort of argument over status which has arisen
> in this case.

*Tidewater Oil Co. v. Travelers Ins. Co.*, 468 F.2d at 988. Like *Stocker*, *Tidewater Oil*

*Company* recognizes that tort principles establish liability, the risk of which parties may

reallocate by contract:

> Neither law nor policy forbids the regular user of contract labor from
> requiring that, in the interest of certainty and uniformity, vicarious liability
> be on the supplier and the supplier fix his contract hiring rate accordingly
> and insure against it if he desires. Conversely, the parties may agree for
> vicarious liability to fall on the user. *Insofar as the furnished workman is
> under traditional tests a borrowed servant, the allocation of ultimate
> responsibility can be in terms of indemnity or of the employee being treated
> as the servant of one party or the other.*

*Tidewater Oil Co.*, 468 F.2d at 988 (emphasis added). Again, ELR's duty, and by

32

extension Bartlett Services' duty of indemnity, only favors WCH and not Dean Wilcox.

We now move beyond Dean Wilcox's arguments based on the language of the parties and WCH's contracts. Dean Wilcox also contends that only a general employer may loan a servant. Wilcox then labels Bartlett Services as the general employer and observes that ELR contracted with WCH for the services of Stephen Basehore. ELR, as an intermediary entity, contracting party, or employer lay between the relationship between Bartlett Services, as general employer, and WCH, as special employer. Wilcox posits that the borrowed servant doctrine cannot favor Bartlett Services since it did not loan Stephen Basehore to WCH.

Although no case law rejects Dean Wilcox's contention, no case law buttresses his position either. Case law does not dictate how a general employer lends its employees or whether the general employer may employ an intermediary lender. Analysis and application of the borrowed servant rule invariably focuses on who exerted control over the servant for the transaction causing an injury. *Brown*, 113 Wn. App. at 651. In some circumstances, the manner in which the general employer lends its servant may impact who controls the work of the servant, but not here. WCH remained in exclusive control of Stephen Basehore's preparation of the critical work package. Application of the gist of the borrowed servant doctrine demands that we reject this argument.

Dean Wilcox next argues that the borrowed servant defense should apply only to lending of laborers, drivers, or machine operators, not Bartlett Services' supplying of the

"brainpower" or professional services of Stephen Basehore. Under Wilcox's contention, demolition work design services constitute "brainpower." The borrowed servant rule, however, does not draw a distinction between forms of work. No case supports Wilcox's position.

General definitions of "servant" also do not support Dean Wilcox's contention. RESTATEMENT (SECOND) OF AGENCY § 220, cmt. a (1958), reads:

> The word "servant" does not exclusively connote a person rendering manual labor, but one who performs continuous service for another and who, as to his physical movements, is subject to the control or to the right to control of the other as to the manner of performing the service. The word indicates the closeness of the relation between the one giving and the one receiving the service rather than the nature of the service or the importance of the one giving it.

Under this definition, Stephen Basehore was a servant and WCH contracted for Stephen Basehore's "services."

Finally Dean Wilcox emphasizes the spurious nature of the contracts among WCH, ELR, Bartlett Services, and Stephen Basehore. He highlights contract provisions that declare Basehore to be the employee of Bartlett Services and spurn Basehore being an employee of WCH. He underlines contract terms that state ELR maintains control over the work of Basehore. Wilcox characterizes the subcontracts among the parties as a fraudulent means of procuring incentive payments from the federal government. He asks this court to enforce the accentuated contract stipulations and impose liability on Bartlett Services as a matter of public policy.

34

Dean Wilcox's public policy argument enjoys allure, but, as with his other arguments, lacks support in the law. To the contrary, *Brown v. Labor Ready Northwest, Inc.*, 113 Wn. App. 643 (2002) supports the conclusion that the practicalities in the field with regard to control of the servant's tasks control over deceitful contract provisions. Wilcox should address this complaint to the federal government or some other higher authority.

## ELR Consulting

We now address, in a shorter breath, Dean Wilcox's assignment of error to the trial court's dismissal of ELR upon a motion for a directed verdict. This court reviews a trial court's ruling on a CR 50 motion for judgment as a matter of law de novo, applying the same standard as the trial court. *Gorman v. Pierce County*, 176 Wn. App. 63, 74, 307 P.3d 795 (2013), *review denied*, 179 Wn.2d 1010, 316 P.3d 495 (2014). CR 50(a)(1) provides:

> If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law.

Dean Wilcox contends that Stephen Basehore was the employee as a matter of law of Bartlett Services and for that reason concedes that Basehore was not an employee of ELR. Wilcox argues ELR remains vicariously liable for the conduct of Basehore, nonetheless, because Basehore was an agent of ELR despite not being an employee.

35

Presumably, Wilcox claims that Basehore was an independent contractor of ELR.

Wilcox argues that ELR had a contractual right to control Stephen Basehore's work and

this right established agency.

Dean Wilcox cites the rule:

> An agency relationship exists when one agrees to act for another under the latter's direction and control. The principal need not actually exercise control; it suffices that he has the right to do so. Whether an agency exists is usually a question for the jury. The court may decide the question only if the facts are undisputed and lead to a single conclusion.

*ITT Rayonier, Inc. v. Puget Sound Freight Lines*, 44 Wn. App. 368, 377, 722 P.2d 1310

(1986) (citations omitted). Wilcox correctly states the law but misapprehends the facts.

ELR had no right to control Stephen Basehore's creation of the work package for

Building 336. Wilcox emphasizes general condition 2 of the WCH-ELR subcontract

provides: "[ELR] shall act as an independent contractor and not as the agent of [WCH] in

performing this Subcontract, maintaining complete control over its employees." Ex. 34

at ELR 000466. But special condition 13 prevails over GC-2 under the contract's order

of precedence clause. The special condition designated WCH's Kim Koegler as

responsible for the technical aspects of Stephen Basehore's work. WCH possessed the

contractual right to control Stephen Basehore's assembling of the work package for the

Building 336. ELR lacked any right to control Basehore's work as a work control

planner, and did not, in fact, control that work.

36

Dean Wilcox claims that Kim Koegler testified that he only performed administrative services with regard to Stephen Basehore's work and never reviewed the work package prepared by Basehore. This argument misstates Koegler's testimony. Koegler declared that he did not review the work package "on a regular basis." RP at 565. He averred that he administered the technical aspects of the use of Basehore's services.

During argument on ELR's motion for judgment, the trial court asked Dean Wilcox's counsel if he agreed Stephen Basehore was not an ELR employee and counsel agreed. Wilcox designated Basehore as an independent contractor of ELR. The trial court correctly noted that a principal is not liable for the torts of the independent contractors. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 476, 296 P.3d 800 (2013); *Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 277, 635 P.2d 426 (1981).

ELR argues that the jury verdict finding Stephen Basehore to be a borrowed servant of WCH excuses it from liability. We need not address this additional argument.

CONCLUSION

We affirm the judgments in favor of Bartlett Services and ELR. The trial court committed no error when submitting the question of Stephen Basehore's borrowed

37

No. 32179-7-III
*Wilcox v. Basehore*

servant status to the jury and granting ELR judgment as a matter of law.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Korsmo, J.

38