**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE FEB 09 2017

CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Feb 9, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DEAN WILCOX, | ) | |
| | ) | |
| Petitioner, | ) | No. 92362-1 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| STEVE BASEHORE; BARTLETT | ) | |
| NUCLEAR, INC; BARTLETT | ) | Filed    FEB 0 9 2017   . |
| SERVICES, INC.; BARTLETT | ) | |
| SUPPORT SERVICES, INC., and | ) | |
| ELR CONSULTING, INC., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

WIGGINS, J.—Dean Wilcox fell 50 feet through an open catwalk hatch onto a concrete floor. Having sustained severe injuries, he sued the on-site safety planner, Steven Basehore, for negligent planning causing the fall; Wilcox also named the safety planner's employer, Bartlett Services, Inc. (Bartlett), and an intermediary company, ELR Consulting, Inc. (ELR), in respondeat superior. Before trial, the court granted ELR judgment as a matter of law. At trial, the court instructed the jury on the borrowed servant doctrine, an extension of respondeat superior. Wilcox appealed both decisions. The Court of Appeals, in a published decision, affirmed. *Wilcox v. Basehore*, 189 Wn. App. 63, 356 P.3d 736 (2015).

We also affirm. We hold that the borrowed servant doctrine is properly a question for the jury where complete control is a disputed fact. Whether the servant

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

is loaned through an intermediary does not preclude application of the doctrine. We decline to consider the implications of Wilcox's indemnification argument because it was raised as a jury instruction challenge for the first time on appeal. We further hold that judgment as a matter of law was properly granted in favor of ELR because no reasonable jury could find that ELR had a right to control Basehore's conduct.

FACTS

I. Factual History

This case stems from a workplace injury and the dismantling of a nuclear facility. The United States Department of Energy's (DOE) Hanford site in southeastern Washington produced nuclear weaponry (specifically plutonium) from 1943 until its closure in 1987.[1] The site itself is vast, covering 586 square miles, and is further surrounded by the Hanford Reach National Monument—land long used to buffer the site's toxic emissions.[2] After decades of plutonium production, the toxic waste clean-up efforts have been similarly substantial: since 1989, thousands of workers have been involved as facilities are "deactivated, decommissioned, decontaminated, and demolished."[3]

---

[1] U.S. DOE, *Hanford History*, HANFORD SITE (Jul. 25, 2016, 7:36 AM), [https://perma.cc/2XHM-BK54].

[2] *See* Proclamation No. 7319, 3 C.F.R. § 7319 (2001) (establishment of the Hanford Reach National Monument (Jun. 9, 2000); noting that the Hanford Reach has been "[m]aintained as a buffer area in a Federal reservation conducting nuclear weapons development and, more recently, environmental cleanup activities, with limits on development and human use for the past 50 years").

[3] U.S. DOE, *Hanford Cleanup*, HANFORD SITE (Jul. 25, 2016, 7:36 AM), [https://perma.cc/5YQ3-8BJC].

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

Washington Closure Hanford LLC (WCH) was a "prime contractor" involved in this cleanup. As demolition work involves many short-term and specialized tasks, WCH used many temporary workers, acquired through "staff augmentation" partners. This case specifically concerns the demolition of "Building 336" at the Hanford site. Wilcox, a millwright, was one of WCH's permanent employees. Basehore, a professional work control planner, was hired as an independent contractor.

### A. *Work Control Planning*

Work control planners help ensure on-site safety by compiling "work packages." These work packages guide on-site work procedures by noting the tasks to be done, detailing their proper sequence, and, critically, identifying potential hazards.[4] Work packages are developed by teams of workers, specialists, and engineers;[5] the work control planner then collects information from the entire work team and puts it in a comprehensive work document.

---

[4] In this case, the process included a "Job Hazard Analysis," identifying dangers and precautions to be incorporated into the work package.

[5] Teams are assembled by a "Responsible Manager"; the team then performs on-the-ground analysis. This team is led by a "Senior Project Engineer," who in turn may delegate supervision to a "Project Engineer." The Project Engineer then supervises the work control planner. To help assess particular risks, "Subject Matter Experts" are consulted on specific issues, such as engineering, health and safety, or environmental concerns. After the work package is completed, a "Field Superintendent" ensures that its guidelines are properly executed. If additional changes are identified in the field, the Responsible Manager makes any necessary corrections to the work package.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

Here, Basehore was one of approximately six people involved in preparing the work package for Building 336 and the only person who was not a WCH employee.[6] The person with comprehensive oversight of the work package was a WCH manager.

### B. The Subcontractors

Basehore's employer, Bartlett, is a Massachusetts corporation providing short-term professional and technical staff to federal government contractors. Bartlett frequently provided WCH with temporary, specialized workers. After confirming Basehore's suitability and availability, WCH contracted with a third company, ELR, which in turn procured Basehore's services.

ELR acted as an intermediary between WCH and Bartlett, according to ELR, "only to trigger" extra federal payments for WCH. ELR qualifies, for purposes of federal government contracts, as a service-disabled veteran-owned small business. According to ELR, WCH's contract with the DOE required that three percent of subcontracting dollars go to service-disabled veteran-owned small businesses, or else WCH would forgo an additional $9 million payment. ELR received a relatively small payment in exchange for acting, according to ELR's counsel, as a "conduit."[7]

---

[6] Basehore's work was directly supervised by a project engineer, a senior project engineer, and the field superintendent, all of whom were WCH employees. Other workers were also purportedly consulted, though attendance at on-site meetings is not recorded.

[7] WCH paid $89/hour for Basehore's services. ELR passed on $85.58/hour of this to Bartlett. Thus, ELR's share of the payment was $3.42/hour. Basehore received $58.71/hour from Bartlett.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

### C. Two-Step Contracting

With ELR as an intermediary, the parties then used a two-step contracting process. Basehore's services were conveyed from Bartlett to ELR by means of one contract (ELR-Bartlett Contract). Ex. 222 at BSI-1. Then Basehore's services were conveyed from ELR to WCH by a second contract (WCH-ELR Contract). Ex. 34 at ELR 000462. By funneling Basehore's services through ELR, WCH counted the contract in its tally of subcontracts with service-disabled veteran-owned small businesses.[8]

Both contracts characterized Basehore as an independent contractor. Ex. 222 at BSI-1; ex. 34 at ELR 000466. The ELR-Bartlett Contract, while not signed by WCH, was created "in support of" WCH. Ex. 222 at BSI-1. The contract established a maximum payment value "for this work from WCH," *id.*, and incorporated by reference exhibits A ("General Conditions") and B ("Special Conditions") of the WCH-ELR Contract, *id.* at BSI-2.

The WCH-ELR Contract includes both general and special conditions, with the special taking precedence over the general. Ex. 34 at ELR 000466 ("Order of Precedence"). General condition (GC) 19 is a comprehensive indemnification provision. *Id.* at ELR 000470. Most relevant is GC 2, which provided that ELR would

---

[8] The superior court judge in this case characterized the two-step arrangement as "just a phony deal to try to help [WCH] earn 9 million bucks." The judge who wrote the appellate court decision similarly referred to the contractual arrangement as "a farce." 189 Wn. App. at 68. The validity of this contracting arrangement is not before us, and we thus decline to comment.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"maintain[] complete control over its employees and all of its lower-tier suppliers and subcontractors," which included Basehore. *Id.* at ELR 000466.

However, the contract's special conditions characterize the situation differently: special condition (SC) 13 designates Kim Koegler of WCH as the party with "ultimate authority over the technical aspects" of Basehore's work.[9] *Id.* at ELR 000486. These technical aspects included preparation of the work package, which Wilcox alleges was negligently prepared.

### D. The Accident

The parties agree as to the subsequent unfolding of events: On July 1, 2009, Wilcox was among those working on a catwalk in Building 336, preparing it for demolition. The work package guiding that day's work was developed by Basehore. During his inspection of Building 336, Basehore had failed to realize that the catwalk was accessed via a hatch that lacked protective guard chains. While Wilcox was still working, some other workers descended; they left the access hatch open with the expectation that the remaining workers would soon follow. Before Wilcox could also descend, he and another worker were asked to finish an additional task. While doing so, Wilcox stepped through the open catwalk hatch, falling 50 feet to the concrete floor below.

---

[9] Bonnie Cole, WCH's subcontract administrator, was assigned to handle the administrative aspects of Basehore's work. Ex. 34 at ELR 000486.

Wilcox survived the fall, sustaining serious injuries to his legs and spine. Wilcox alleges that Basehore's negligent development of the work package and safety protocols led to his fall and resulting injuries.

II. Procedural History

Wilcox filed suit against Basehore, Bartlett, and ELR for negligence. Wilcox later voluntarily dismissed Basehore from the suit. The remaining parties filed cross motions for summary judgment, which were denied. ELR later filed a second motion for summary judgment, which was also denied. At the close of evidence, ELR brought a CR 50 motion for judgment as a matter of law, which was granted. The remaining claims against Bartlett proceeded to trial.

At trial, Wilcox strongly disputed the jury instructions proposed by Bartlett and ELR. Two instructions in particular, instruction 12 and instruction 13, directed the jury to consider the "borrowed servant doctrine." These instructions were as follows:

INSTRUCTION NO. 12

. . . .

[I]f . . . the defendant proves that Steve Basehore was a borrowed servant of Washington Closure Hanford, your verdict should be for the defendant.

INSTRUCTION NO. 13

Under the borrowed servant doctrine, a worker in the general employ and pay of one employer may be loaned to another. If an employer meets its burden of proving by a preponderance of the evidence that the worker is a "borrowing servant" that employer is not liable for the worker's negligence.

In order for a person to be a "borrowed servant", the general employer must surrender, and the borrowing employer must assume, exclusive supervision and control over the worker. Exclusive control for

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

all purposes is not required. Rather, the question is whether the borrowing employer has exclusive control of the borrowed worker for the transaction causing injury.

Defendant has the burden of proving borrowed servant by a preponderance of the evidence.

Pursuant to these instructions, if the jury found that WCH had exclusive control over Basehore's allegedly negligent actions, then only WCH would be potentially liable. As a result, Wilcox would be confined to worker's compensation as his sole remedy.[10]

The jury found that Basehore was under WCH's exclusive control with respect to his allegedly negligent conduct. Because the jury concluded that Basehore was a borrowed servant of WCH, it did not need to consider the remaining issues, including whether Basehore was negligent, whether the alleged negligence caused Wilcox's injury, or what damages Wilcox might have incurred. Judge Spanner entered judgment in favor of Bartlett. Wilcox appealed.

On appeal, Wilcox renewed his arguments that (1) the borrowed servant doctrine does not apply and (2) the trial court erred in granting ELR's motion for judgment as a matter of law. In support of his challenge to the borrowed servant doctrine's application, Wilcox also argued for the first time on appeal that the doctrine was superseded by ELR's indemnification agreement with WCH.

---

[10] In a claim against one's own employer, Washington workers' compensation system provides the sole remedy, with the exception of intentional injury by the employer. RCW 51.04.010 (noting that "[t]he common law system governing the remedy of workers against employers for injuries received in employment is inconsistent with modern industrial conditions" and "proves to be economically unwise and unfair"). The statute provides "sure and certain relief for workers, injured in their work, and their families and dependents is hereby provided regardless of questions of fault *and to the exclusion of every other remedy*, proceeding or compensation, except as otherwise provided in this title." *Id.* (emphasis added).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

In a published decision, the Court of Appeals considered all arguments presented (including the new indemnification issue) and affirmed the trial court's decisions (1) submitting the borrowed servant doctrine to the jury and (2) granting ELR's motion for judgment as a matter of law. *Wilcox*, 189 Wn. App. 63.

Wilcox then petitioned this court for review, noting that we have not revisited the borrowed servant doctrine in nearly 30 years. The parties requested clarification of the scope of the borrowed servant doctrine when the servant is loaned through an intermediary and when contractual language characterizes the servant as an independent contractor. The parties also continued to disagree whether WCH's exclusive control of Basehore was a disputed fact subject to resolution by the jury and whether the trial court erred in dismissing ELR by a directed verdict.

## STANDARD OF REVIEW

A trial court's decision to instruct the jury on a point of law is reviewed de novo. *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). The instructions "'are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)).

We also afford de novo review to judgments as a matter of law. *Anaya Gomez v. Sauerwein*, 180 Wn.2d 610, 616, 331 P.3d 19 (2014). "A directed verdict is appropriate if, as a matter of law, there is no substantial evidence or reasonable

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

inference to sustain a verdict for the nonmoving party." *Chaney v. Providence Health Care*, 176 Wn.2d 727, 732, 295 P.3d 728 (2013). Substantial evidence exists "'if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting *Brown v. Superior Underwriters*, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)).

## ANALYSIS

The primary issue in this appeal is the applicability of the borrowed servant doctrine when the servant is loaned through an intermediary. If the doctrine does not apply in this situation, then the jury instructions in this case were erroneous and the case must be returned for a new trial. We conclude that the doctrine does apply and the jury was correctly instructed. We affirm.

I. <u>Whether the Jury Was Properly Instructed To Consider the Borrowed Servant Doctrine</u>

The borrowed servant defense is a legal fiction that expands the concept of respondeat superior. *Stocker v. Shell Oil Co.*, 105 Wn.2d 546, 548, 716 P.2d 306 (1986). Under respondeat superior, an employer is vicariously liable to third parties for torts committed by the servant within the scope of employment. RESTATEMENT (SECOND) OF AGENCY § 219 (AM. LAW INST. 1958).

An exception exists, however, when a servant's general employer loans the servant to another, or "special," employer. For those activities over which the special employer exercises complete control, the special employer also assumes vicarious liability under the "borrowed servant" doctrine. *Macale v. Lynch*, 110 Wash. 444, 448, 188 P. 517 (1920) ("It is . . . well settled law that one who is in the general employ and

10

pay of one person may be loaned, or hired, by his employer to another, and when he undertakes to do the work of the other he becomes the servant of such other, to perform the particular transaction.").

Yet the borrowed servant doctrine does not require complete and exclusive control over all aspects of the loaned worker's conduct. Liability arises out of those particular transactions over which the special employer has exclusive control. *Stocker*, 105 Wn.2d at 548 ("If it can be established that the servant had borrowed servant status at the time of performance of such transaction, the servant's general employer can escape liability for damage or injuries flowing from the transaction."); *see also* RESTATEMENT (SECOND) OF AGENCY § 227 (A borrowed servant "may become the [special employer's] servant as to some acts and not as to others.").

Whether the special employer had exclusive control for the relevant transaction is generally a question of fact for the jury. *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 258-59, 386 P.2d 958 (1963) (finding that "the evidence fail[ed] to establish" that one party had "exclusive control" and thus finding that the question was properly submitted to the jury).

A. *Where the Worker Is Loaned through an Intermediary*

Wilcox argues that the borrowed servant doctrine should not apply in this case because a two-step loan scenario does not fit a strict definition of the doctrine; he asks us to avoid any novel applications of the doctrine because it "results in the destruction

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

of valuable common-law rights."[11] Wilcox defines the doctrine as: "A loans his servant to B, under such circumstances that B assumes complete control and direction of the servant's work." Thus, Wilcox contends, where A loans a servant to B, who further loans him to C, the borrowed servant doctrine should not apply. This argument fails to serve either the definition or the purpose of the doctrine.

First, the definition Wilcox describes is artificially narrow. We have repeatedly described the doctrine not as a mathematical formula, but as a concept by which "one who is in the general employ and pay of one person may be loaned, or hired, by his employer to another." *Macale,* 110 Wash. at 448. The "A to B" characterization of the doctrine is illustrative, not definitive. It is reasonable that employers would generally loan employees directly to the party who needs them; that this path is common, however, does not make it necessary. Wilcox asks us to require that servants be borrowed directly in order to satisfy the borrowed servant doctrine. In so doing, we would arbitrarily shrink the boundaries of the borrowed servant doctrine, not simply preserve its scope.[12]

---

[11] Here, Wilcox quotes *Novenson v. Spokane Culvert & Fabricating Co.*, 91 Wn.2d 550, 554-55, 588 P.2d 1174 (1979). Yet this language in *Novenson* more applicably explains why we require clear consent when the borrowed servant is also the plaintiff. In *Novenson*, we emphasized the potential unfairness to the loaned servant who, having been borrowed, is no longer able to recover against his own employer. *Id.* at 554. Thus, the employee's consent to being loaned should not have been implied and must have been explicitly obtained before the borrowed servant doctrine could apply. *Id.* at 553.

[12] Wilcox emphasizes the monetary motivations for using the two-step structure in this case as a reason to preclude application of the borrowed servant doctrine. That one party has used a route in a potentially objectionable fashion, however, is an insufficient reason to find the route itself improper. Similarly, Wilcox comments that "[t]he doctrine typically has been applied to situations involving laborers" rather than "highly specialized professional services,"

12

Second, Wilcox's emphasis on the conveyance process is inconsistent with the doctrine's essential purpose. In a borrowed servant doctrine analysis, we consistently focus on one basic question: Who controls the servant's conduct? *See, e.g., Macale*, 110 Wash. at 448 ("The controlling facts in these cases, and in all others which support the rule, is that the servant must have been in the exclusive control of the one to whom he is loaned.").[13] We emphasize control because the very premise of the borrowed servant doctrine is to hold accountable those who can account for the allegedly tortious action. Wilcox offers neither authority nor argument for why we should abruptly reframe our analysis to focus on whether the servant was borrowed directly from the general employer or borrowed in multiple steps.

It is consistent with both the definition and the purpose of the borrowed servant doctrine to apply it to situations of "double borrowing"—as in this case, where the general employer loans a servant to a second party, who loans the servant to a third party.

---

yet no principled support is either offered or apparent for enforcing this sort of arbitrary distinction between manual and professional work.

[13] *See also McHugh v. King County*, 14 Wn.2d 441, 445, 128 P.2d 504 (1942) ("He who controls the actions and directs the work or action of another is responsible for the acts of the one to whom the instruction is given."); *Christiansen v. McLellan*, 74 Wash. 318, 320, 133 P. 434 (1913) ("'The test is whether, in the particular service which [the servant] is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is let or hired.'" (quoting *Coughlan v. Cambridge*, 166 Mass. 268, 277, 44 N.E. 218 (1896))); *Boe v. Hodgson Graham Co.*, 103 Wash. 669, 670, 175 P. 310 (1918) ("[W]e must look to the evidence in the case to determine who was in fact [the borrowed boat's] master."); *Olson v. Veness*, 105 Wash. 599, 601, 178 P. 822 (1919) (noting that "the question of control of operation is the determining factor").

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

### B. *Where Exclusive Control Is a Disputed Fact*

Wilcox argues that WCH did not have "exclusive control" over Basehore sufficient to satisfy the borrowed servant test. Whether the special employer has exclusive control is a question of fact for the jury. *Davis*, 63 Wn.2d at 259. Here, the jury was explicitly asked to find whether WCH exercised exclusive control over Basehore "for the transaction causing injury," and concluded that such control was established.

Wilcox counters that submission to the jury was precluded because Bartlett "admitted it never gave up exclusive control over the core of Mr. Basehore's work – safety." Bartlett acknowledged that it expected Basehore to abide by its own safety plan "as well as our customers' programs." Bartlett's president further clarified that "[t]he site's plan is the overriding safety plan to be used while our employees are there," though Bartlett's plan may be followed if it is more conservative. While Wilcox concludes that these statements are an admission of Bartlett's ongoing control over safety matters, they do not foreclose exclusive control by WCH over a given safety-related activity. Exclusive control is task specific, not topic specific.

Thus, the basic factual dispute remained: Did Bartlett's or WCH's safety plan govern Basehore's actions in this instance? This is a factual question that was properly submitted to the jury.

### C. *Where Contractual Language Characterizes the Worker as an Independent Contractor*

Wilcox further argues that the parties' "contractual agreements trump the borrowed servant defense," noting that this rule "was established long ago." Here, the

14

contracts described Basehore as an independent contractor. An independent contractor, by definition, is not under the control of the party for whom he works. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 476, 296 P.3d 800 (2013). As a result, Wilcox argues, we must find that the parties' contractual language precludes application of the borrowed servant defense. This conclusion misstates our case law and conflates two contract-related issues.

Wilcox mistakenly relies on our holding in *Stocker*, which specifically addressed indemnification agreements. 105 Wn.2d 546. Wilcox paraphrases *Stocker*'s holding as: "When contractual terms are contrary to the borrowed servant defense, those terms must be given effect over the defense." This oversimplifies *Stocker*'s holding, as that case solely concerned the impact of indemnification agreements—a discrete legal issue.

In *Stocker*, Shell Oil Company made use of temporary workers supplied by a labor contractor, P.M. Northwest Inc. 105 Wn.2d at 547. Negligence by one of the loaned laborers led to a fire at Shell's oil refinery, killing two other borrowed workers, including Ed Stocker. *Id.* The personal representatives of the slain men sued Shell, which settled. *Id.* Shell then sought indemnification from P.M. Northwest pursuant to an indemnification agreement between the two companies. *Id.* Noting that "[i]ndemnity agreements are essentially agreements for contractual contribution," we concluded that "an express contractual agreement *for indemnification* must prevail over the tort defense of 'borrowed servant'." *Id.* at 549 (emphasis added). Similarly, the borrowed servant doctrine allocates the cost of liability between the special and general employers. Wilcox's omission of the indemnification qualification significantly

15

overstates *Stocker*'s implications. And Wilcox offers no other support for his argument that contractual descriptions must or should overcome the reality of exclusive control.

Indeed, parties sometimes characterize their loaned workers as "independent contractors" or "employees" for different purposes, including responsibility for benefits, taxes, and training. In fact, this reflects the parties' behavior in this case, as Bartlett retained responsibility for paying, training, and providing other benefits associated with Basehore's employment. Wilcox offers no reason why we should require a worker to be treated identically for all purposes; indeed, the borrowed servant doctrine itself allows that a worker may be a borrowed servant for one task and an independent contractor for another. RESTATEMENT (SECOND) OF AGENCY § 227 (A borrowed servant "may become the [special employer's] servant as to some acts and not as to others."). Imposing uniform treatment on a given worker would be a novel departure. Wilcox does not provide any argument or authority for why we should take this step, and we decline to do so.

### D. Contractual Indemnification Issue

On appeal, Wilcox argues that "the parties allocated to ELR liability for any harm" caused by Basehore in the indemnity provision of the WCH-ELR Contract. Ex. 34 at ELR 000470. Bartlett and ELR object that this issue is precluded because it was not raised at trial.

Failure to raise an issue before the trial court generally precludes a party from raising it on appeal. RAP 2.5. While "this rule insulates some errors from review, it encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

policies of economy and finality." *State v. Kalebaugh,* 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

For objections to jury instructions in particular, an appellate court usually considers a claimed error *only* if the appellant raised the specific issue at trial. *Galvan v. Prosser Packers, Inc.*, 83 Wn.2d 690, 692, 521 P.2d 929 (1974) (noting that consideration of errors in instructions on appeal "is limited to those issues specifically raised" at trial); *see also Trueax v. Ernst Home Ctr., Inc.*, 124 Wn.2d 334, 339, 878 P.2d 1208 (1994).

Here, Wilcox failed to mention contractual indemnification in his challenge to the borrowed servant doctrine jury instructions. All parties acknowledge that Wilcox vehemently opposed the borrowed servant instructions generally and made multiple arguments for the doctrine's exclusion. However, as noted above, the implications of an indemnity agreement is a discrete exception to the borrowed servant doctrine: as a bargained-for allocation of liability between parties, it trumps allocation by common law as between those parties. There was no reason for the trial court to know that arguments concerning general contractual language also raised a specific legal argument concerning WCH and ELR's indemnification agreement.

As a result, the trial court was inadequately apprised of the points of law in dispute relating to the indemnification provision. We therefore decline to consider this issue.

II.  Whether ELR Was Entitled to Judgment as a Matter of Law

Wilcox argues that the trial court improperly granted ELR judgment as a matter of law because a principal-agent relationship existed, giving rise to vicarious liability.

17

*Wilcox v. Basehore et al.*, No. 92362-1

We extend vicarious liability where a principal "is accountable" for the actions of an agent. *Chi. Title Ins. Co. v. Office of Ins. Comm'r*, 178 Wn.2d 120, 143, 309 P.3d 372 (2013). While we consider whether a principal exercised authority, actual exercise of control is not necessary so long as "the principal had the right to control the details of the agent's performance." *Id.* However, "a principal who hires an independent contractor is not liable for harm resulting from the contractor's work." *Afoa,* 176 Wn.2d at 476.

The crucial distinction is the right to control. In considering whether "a relationship between a superior business party and a subordinate business party" is a principal-agent relationship or an "independent contractorship[,] . . . the most crucial factor is the right to control the details of the work." *Larner v. Torgerson Corp.*, 93 Wn.2d 801, 804-05, 613 P.2d 780 (1980). Where there is no right to control, then the subordinate party is an independent contractor. *Id.* This distinction "can only be decided as a matter of law where there are no facts in dispute and the facts are susceptible of only one interpretation." *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 302-03, 616 P.2d 1223 (1980).

Here, the parties agree that ELR did not employ Basehore. As Wilcox notes, "BSI, ELR and WCH all agreed in writing that Basehore was acting as an independent contractor." Wilcox further states that "[t]hose writings correctly described the relationship."[14] In oral argument concerning ELR's directed verdict motion, Wilcox's

---

[14] Wilcox reiterates the belief that Basehore was ELR's independent contractor as support for the assertion that ELR was unable to loan Basehore to WCH.

18

counsel again agreed that Basehore was ELR's independent contractor. Nonetheless, Wilcox asserts that a principal-agent relationship existed between ELR and Basehore, leaving ELR vicariously liable for Basehore's alleged negligence: "ELR had a right, *and an obligation*, to control Mr. Basehore or at least ensure his work was performed in a safe, professional manner."

It is worth emphasizing that Wilcox is arguing for the truth of two mutually exclusive facts: (1) that Basehore was an independent contractor of ELR and (2) that ELR had the right to control Basehore's work. This confusion is understandable, as it is rooted in mutually exclusive provisions of the WCH-ELR Contract, described below.

In reviewing ELR's motion for a directed verdict as a matter of law, the trial court held that Basehore was not an agent of ELR, granting the motion. During argument, the court provided two bases for its decision: First, the "mere right [to control] is not enough without some exercise of it." Second, the parties all agreed that Basehore was properly deemed an independent contractor and that "a principal is not liable for the torts of the independent contractors." The Court of Appeals affirmed on the basis that "ELR had no right to control" Basehore's work.[15] *Wilcox*, 189 Wn. App. at 95. We agree.

Significant confusion on this issue arises out of conflicting contractual provisions in the WCH-ELR Contract. Wilcox relies largely on GC 2, which required ELR to "maintain[] complete control over its employees and all of its lower-tier

---

[15] The Court of Appeals correctly restates our precedent, as we explicitly provide that the right to control is itself a sufficient basis for an agency relationship; exercise of control is not required. *Chi. Title*, 178 Wn.2d at 143.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

suppliers and subcontractors," including Basehore. Ex. 34 at ELR 000466. However, SC 14 established that Basehore was an independent contractor. *Id.* at ELR 000486. SC 13 further provided for comprehensive supervision of Basehore's technical and administrative duties by WCH employees.[16] *Id.*

While these general and special conditions appear to conflict, the contract itself resolves the issue: GC 6 provides that special conditions take precedence over general conditions. *Id.* at ELR 000466-67. As a result, GC 2, stating that ELR exclusively controlled Wilcox, gives way to SC 1, providing that Wilcox was an independent contractor as to ELR, and to SC 13, stating that Wilcox was subject to WCH's control. Thus, the contract does not grant ELR any right of control over Basehore on its own terms.

Were there additional evidence outside the four corners of the contract tending to establish ELR's right to control Basehore, the alleged principal-agency relationship might remain a fact question for the jury. However, the only evidence offered is the contract itself, which is unavailing, and outside evidence only supports the understanding that ELR lacked control over Basehore entirely: the parties agree that ELR's role was to provide a "conduit." Thus, even viewing the evidence in the light

---

[16] Wilcox argues that SC 13 "addresses only technical-administrative requirements of the subcontract, not the technical work safety planning performed by Basehore." This argument contains its own refutation. Basehore's job, all agree, was to develop a work safety plan. This is a technical matter, assigned pursuant to a technical services subcontract. Wilcox himself describes the task as "technical work safety planning." Ex. 34 at ELR 000486. Thus, it is unclear how Koegler's "ultimate authority" for "technical aspects" of Basehore's work could not encompass the work safety plan at issue. *Id.*

20

*Wilcox v. Basehore et al.*, No. 92362-1

most favorable to Wilcox, "there is no substantial evidence or reasonable inference to sustain a verdict" in his favor. *Chaney*, 176 Wn.2d at 732.

We affirm the directed verdict for ELR.

## CONCLUSION

We hold that the trial court properly instructed the jury to consider the borrowed servant doctrine. The doctrine is properly submitted to the jury where complete control is a disputed fact. Whether the servant is loaned through an intermediary does not preclude application of the doctrine. We decline to consider Wilcox's indemnification exception argument as it was raised for the first time on appeal. We further hold that ELR was properly granted judgment as a matter of law because there is no substantial evidence that ELR had a right to control Basehore.

Therefore, we affirm the Court of Appeals.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wilcox v. Basehore et al.*, No. 92362-1

_____
Wiggins, J.

WE CONCUR.

_____
Fairhurst, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
González, J.

_____
Yu, McCloud, J.

_____
Yu, J.

22