54 P.3d 166 (2002)
113 Wash.App. 511
Joyce BROWN, a single woman, Appellant,
v.
LABOR READY NORTHWEST, INC., a Washington corporation, d/b/a Labor Ready, Respondent.
No. 49536-4-I.
Court of Appeals of Washington, Division 1.
September 16, 2002.
*167 Harry Platis, Damon Platis, Denis Wade, Platis Law Firm, Lynnwood, WA, Philip Talmadge, Talmadge & Stockmeyer, Tukwila, WA, for Appellant.
Pamela Andrews, Johnson Christie Andrews & Skinner, Seattle, WA, for Respondent.

*168 PUBLISHED OPINION
ELLINGTON, J.
Joyce Brown was seriously injured while working at CMI Northwest. She alleges her injury was caused by the negligence of a forklift operator sent to CMI by a labor agency. Brown sued the agency on theories of vicarious and direct negligence. Her suit was dismissed on summary judgment. The borrowed servant doctrine applies to bar Brown's vicarious negligence claim, and the evidence does not support her direct negligence claim. The trial court properly dismissed, and we affirm.

FACTS
Joyce Brown was a long-term employee of CMI, a lumber distribution center. Russell Henson was employed by Labor Ready Northwest, Inc., which is a national provider of temporary manual labor employees. CMI customarily used Labor Ready as a source of temporary labor. CMI's yard supervisor, Lawrence Stevens, arranged for Labor Ready workers when needed, and assigned their work. Labor Ready dispatched workers on a daily basis, with a four-hour minimum, and billed CMI according to hours worked and type of work performed.
Labor Ready first sent Henson to CMI to work as a general laborer. Henson told Stevens he was qualified to operate heavy machinery. Stevens considered Henson a good worker. He asked Labor Ready about Henson's qualifications, and was advised Henson was qualified to operate a forklift. Stevens observed Henson operate the CMI forklift, concluded he was capable, and assigned him forklift duties.
February 19, 1999 was Henson's fourth day of work at CMI. Brown and Henson were working in the yard, readying bundles of lumber for cutting into lengths for a customer's order. Henson had a 40-foot bundle of lumber on his forklift, and Brown was trying to manually push the bundle flat, off edge, so it could be more easily cut. Brown alleges Henson improperly handled the forklift, and the bundle became unstable and fell on Brown's legs. Henson then mistakenly accelerated the forklift forward and pinned Brown between two bundles. Another CMI employee took over and used the forklift to remove the lumber from Brown's legs.
Brown was seriously injured. She received worker's compensation benefits, and also filed suit against Labor Ready on theories of vicarious liability for Henson's negligence, negligent hiring/retention of an unqualified employee, and failure to properly train and supervise Henson. Labor Ready asserted that the borrowed servant doctrine constituted a complete defense as to vicarious liability, that it had no duty to train Henson, and that Brown had no evidence of any direct negligence on its part. The trial court granted Labor Ready's motion for summary judgment on all claims. Brown appeals. We apply the usual standard in reviewing summary judgment.[1]

DISCUSSION
Vicarious Liability. An employer is vicariously liable for injuries caused by the negligence of its employee.[2] Vicarious liability depends upon the liability of the negligent agent to the injured plaintiff; if a plaintiff is barred from suit against the negligent employee, she cannot sue the employer on a theory of vicarious liability.[3] An employee injured by a coworker's negligence is limited to the remedies provided by Washington's worker's compensation system;[4] she may not sue the coworker for his negligence. She may, however, sue a third party "not in the same employ."[5] Thus, the dispositive question here is whether Henson was Brown's coworker.
This depends upon whether Henson was the borrowed servant of CMI. If Henson *169 worked only for Labor Ready, then Labor Ready must answer to Brown under the rule of respondeat superior. If, on the other hand, Henson was also employed by CMI as its borrowed servant, Henson was Brown's coworker, in which case the industrial insurance statutes bar a negligence action against Henson, and therefore also bar any action against Labor Ready on a theory of vicarious liability.
Under the borrowed servant doctrine, a worker in the general employ and pay of one person may be loaned or hired to another. When the worker undertakes the work of the other, the worker becomes the servant of the other for the particular transaction, and the general employer may escape liability for the worker's negligence: "If it can be established that the servant had borrowed servant status at the time of performance of such transaction, the servant's general employer can escape liability for damage or injuries flowing from the transaction."[6]
The borrowed servant doctrine has been a frequent source of confusion.[7] The source of the difficulty, at least for our purposes, is that while the doctrine derives "from the common-law rules developed primarily for the purpose of respondeat superior or vicarious liability,"[8] it is usually encountered in the context of claims where the borrowed servant suffers the injury: "The borrowed servant defense has arisen in a variety of contexts. Its most common modern use is as a sword or a shield to circumvent workmen's compensation laws."[9] In such cases, the borrowed servant has suffered injury, and the question is whether the worksite employer may escape liability for negligence by establishing its employer status and consequently its immunity under industrial insurance statutes. Therefore, in these cases "the spotlight focuses on the employee ... rather than on the employer[.] The important question ... is: Did the workman consent with the `employer' to the status of `employee'?"[10]
In the common law context, the test for application of the doctrine is slightly different. Our cases have explained the difference between worker's compensation and common-law applications of the doctrine. In Fisher v. Seattle,[11] the court quoted extensively from 1 LARSON, WORKMEN'S COMPENSATION LAW § 47.10 (1952):
"The sole concern of the vicarious liability rule, then, is with the master: did he accept and control the service that led to the stranger's injury? If he did, it is of no particular importance between him and the stranger whether the servant enjoyed any reciprocal or contractual rights vis-à-vis the master. Accordingly, the Restatement of Agency says plainly that the master must consent to the service, but nowhere requires that the servant consent to serve the master or even know who he is.
"Compensation law, however, is a mutual arrangement between the employer and employee under which both give up and gain certain things.... To thrust upon a worker an employee status to which he has never consented would not ordinarily harm him in a vicarious liability suit by a stranger against his employer, but it might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common-law damages."[12]
The Fisher court then concluded: "Thus, a workman might be deemed an `employee' for the purpose of the vicarious liability of a master to a third party while, under the same facts, he may not be an `employee' for purposes of workmen's compensation issues."[13]
*170 Where a worker's compensation issue is involved, borrowed servant status exists where "(1) the employer has the right to control the servant's physical conduct in the performance of his duties, and (2) there is consent by the employee to this relationship."[14] Brown contends this test applies here. She argues that questions of fact exist as to both control and consent.
The proper test under these circumstances, however, requires only proof of control, not consent. As the court observed in Novenson v. Spokane Culvert,[15] the sole concern for vicarious liability (as opposed to worker's compensation immunity) is whether the master accepted and controlled the service that led to the injury. Consent of the borrowed employee is thus irrelevant in cases where the borrowed employee is not the claimant.
Facts analogous to those here were before the court in Nyman v. MacRae Brothers Construction.[16] There, Seaborn Pile Driving Company leased a large crane from MacRae, together with an operator and an oiler. The crane operator pulled a wrong lever, resulting in injury to Seaborn's employee, Nyman. Nyman sued MacRae.
MacRae asserted the borrowed servant doctrine as a defense. The jury found the crane operator was the borrowed servant of Seaborn at the time of Nyman's injury. Nyman contended on appeal that the question was not properly before the jury because, as a matter of law, McRae was the operator's employer. The Supreme Court observed that there were three possible conclusions about the status of the crane operatorthat he was the servant of his general master MacRae, the servant of the borrowing master Seaborn, or the servant of both companies: "There can be no question that `[h]e may become the other's servant as to some acts and not as to others.'"[17] Since the operator was clearly still the employee of the crane company, the sole issue was whether he became also the employee of Seaborn, for purposes of the transaction that caused Nyman's injury.
The court discussed only evidence pertaining to control. Consent was never mentioned:
(1) [The crane operator] was expected not only to give the results called for by his temporary employer, the Seaborn Pile Driving Company; he was expected to use the crane in the manner desired by that company; (2) it was specifically requested that [the crane operator], personally, work as the operator of the crane during the negotiation of the lease agreement; (3) Mobile Crane Company had relinquished all right to control [the crane operator] in his operation of the machine at the Seaborn Pile Driving Company construction site; and (4) Seaborn Pile Driving Company exercised that right of control by giving specific orders to [the crane operator], which he obeyed.[18]
The court held this evidence warranted the jury's conclusion that Seaborn had the right to control and was controlling the crane operator's actions at the time of the injury, and that the operator was therefore Seaborn's servant.
The evidence here is essentially identical, except that two additional indicia of CMI's control pertain. Here, the machinery that caused injury belonged not to Labor Ready, but to CMI. Further, Henson was sent not to perform a single specific transaction at the behest of his general employer, but to do the work asked of him by CMI. CMI directed him to use the forklift, and CMI told him what to do with it. Labor Ready had no *171 right to control his operation of the machine, and indeed was not present at the worksite.
Brown argues, however, that Henson was not CMI's servant because Labor Ready did not relinquish exclusive control to CMI. She relies upon Davis v. Early Construction Company.[19] But exclusive control for all purposes is not required, as the facts of Nyman clearly demonstrate. Rather, the question is the control of the borrowed servant by the borrowing employer for the transaction causing injury.
Indeed, Davis is perhaps the most useful precedent here. A glass company owner asked a friend, who owned a construction company, for the loan of a forklift and two men to assist in unloading a freight car. Davis worked for the glass company. He was injured, allegedly by the negligence of the forklift driver. There, as here, suit was filed against the driver's general employer (the construction company) as a third party tortfeasor on a theory of vicarious liability. The court held that "[t]he question presented... turns upon the applicability of the loaned servant doctrine rather than upon the interpretation of and the immunity provided by RCW 51.24.010. The issue is vicarious liability, not statutory immunity."[20] The court observed that under those circumstances, the controlling factor is "`that the servant must have been in the exclusive control of the one to whom he is loaned[.]'"[21] Because the glass company foreman gave only general instructions on how to handle the crates and where to put them, and then left the worksite, after which the unsupervised forklift operator took charge of the unloading operation, the court held that whether the glass company had exclusive control was a question of fact.[22]
Here, there is no indication that Henson took charge in the absence of CMI direction. To the contrary, Henson was performing his work at the CMI yard under the direction of CMI workers, and was operating a CMI forklift. CMI, and only CMI, had control over Henson at the job site. Each day, Henson reported to and had his timecards signed by CMI's yard supervisor, Stevens, who instructed Henson regarding his duties and monitored his work. CMI provided the equipment necessary to perform the job. Moreover, there was no Labor Ready employee on site to supervise the work of the dispatched temporary employees.
Despite this evidence, Brown nonetheless contends there is at least a question of fact as to CMI's control over Henson. She makes three arguments. First, she points out that Henson was sent by Labor Ready with a work ticket outlining conditions of service, including the requirement that CMI carry insurance on equipment used by Henson, and not (without written consent of Labor Ready) utilize him in excavation work without proper shoring and protection, nor for any work on ladders or scaffolding. Brown argues Labor Ready thereby retained sufficient control to create a question of fact. But this argument is unavailing. The work ticket conditions may have created contract rights in Labor Ready, but they did nothing to limit CMI's authority over Henson in the performance of his assigned duties.
Second, Brown argues that the four-hour minimum duration of employment, resulting in new daily contracts between CMI and Labor Ready for each employee, indicates an insufficient duration of employment for control to exist. We reject this argument. Nothing in Novenson or Nyman or Davis turned upon duration of service.
Finally, Brown argues Henson was increasingly independent during his time at CMI and did not respond to authority. Brown testified that she saw Henson using a chain saw improperly and was told, "He is one of those Labor Ready guys, just stay away from him while he is using the chain saw."[23] She also testified that she found *172 Henson unresponsive to direction about how to do things. This evidence does not, however, indicate that CMI did not have the power of authoritative direction over Henson. In sum, the record leaves no question as to CMI's control over Henson.
Brown next turns to the issue of Henson's consent to be CMI's employee. But as indicated, in a suit based on vicarious liability, we apply the common law test, which does not require proof of consent because no rights of the loaned employee are at issue.[24] Thus, while there may be a question of fact regarding Henson's consent[25] (one particularly hard to answer, since Henson's whereabouts are unknown), we do not agree that the question is material. The cases upon which Brown relies, those turning on the consent prong, involve a borrowed servant who was injured and sought to sue the borrowing employer for negligence; in those cases, to protect the common law and worker's compensation rights of a borrowed servant, we require proof of consent by the servant before barring his suit.[26] Here, however, the borrowed servant was not injured and the borrowing employer is not accused of negligence. Rather, Brown seeks to sue the lending employer. Consent is irrelevant.
Brown contends, however, that because a temporary labor agency has no workforce other than its inventory of workers for hire by others, the worker's compensation test should apply. Two recent cases have involved temporary labor agencies (although neither addressed the argument Brown suggests).[27] In each, the borrowed servant was injured, and claimed the injury was caused by the negligence of the borrowing employer. Brown relies upon the following passage from Novenson:
For whatever reason, Spokane Culvert found it advantageous to contract with Kelly to provide it with temporary workers.... Spokane Culvert seeks the best of two worldsminimum wage laborers not on its payroll, and also protection under the workmen's compensation act as though such laborers were its own employees. Having chosen to garner the benefits of conducting business in this matter, it is not unreasonable to require Spokane Culvert to assume the burdens.[28]
Brown contends Labor Ready, like Spokane Culvert, seeks the best of two worlds. But Spokane Culvert was the borrowing employer, and sought immunity from suit for its own alleged negligence in (among other things) failing to provide safety devices for the rolling machine that crushed Novenson's hands. The facts are different here; Labor Ready does not rely on the borrowed servant doctrine to shield itself from its own negligence. Labor Ready is not like Spokane Culvert.
Nor is Brown's position like Novenson's or Rideau's. They were the borrowed servants, injured while on loan to an allegedly negligent employer. Rather, Brown is in the position of any third party pursuing a claim for vicarious liability. Had Henson's negligence caused injury to a customer of CMI, the customer's cause of action would be against CMI, not Labor Ready, because CMI had control over Henson at the time of the acts giving rise to injury. Brown's position is different from the customer's only because the worker's compensation statutes prevent her from suing her own employer.[29] The *173 fact she is precluded from suit against CMI does not, by itself, create a cause of action against Labor Ready.
The trial court did not err in dismissing Brown's action for vicarious liability.
Direct Negligence. Brown argues the trial court erred in dismissing her direct negligence claims against Labor Ready. These claims have changed character on appeal. Below, Brown pled and argued that Labor Ready negligently hired and retained Henson[30] and negligently failed to properly train and supervise[31] him. On appeal, she argues the trial court erred by dismissing claims of negligent misrepresentation and breach of warranty. Neither misrepresentation nor warranty was pleaded or argued below. Brown's argument on appeal intermixes her claim of negligent hiring/retention/training with her new claim that Labor Ready negligently misrepresented Henson's qualifications. We will not consider a theory raised for the first time on appeal.[32] We therefore confine our attention to the claim that Labor Ready was negligent in hiring or retaining or training Henson.
An employer may be liable for harm caused by an incompetent employee if the employer knows or should know the employee is unfit, the employee's unfitness is a proximate cause of harm, and the harm is foreseeable.[33]
Brown contends Henson was not qualified to operate the forklift, and therefore Labor Ready negligently hired or retained him. This is a nonsequitur. Labor Ready first sent Henson to CMI as a general laborer, and there is no contention he was not qualified to be one. Labor Ready simply included Henson in its pool of available temporary workers. Conceivably there could be negligence in creating such a pool, as where a dangerous or reckless person is included. But lack of qualification for particular tasks is not a basis for a claim of negligent hiring or retention in such circumstances.
Brown's chief contention is that Labor Ready negligently failed to train Henson to operate the forklift. Brown relies principally upon the provisions of WAC 296-24-23025, which requires forklift drivers to complete certified training classes and prohibits an employer from permitting an employee to operate a forklift unless the employee has completed the training. Brown points out there is no evidence that Labor Ready ensured Henson was certified, and presents the declaration of a workplace safety expert to the effect that if Henson had been properly trained and certified, her injuries could likely have been avoided. She argues that Labor Ready was required to ensure Henson's training, and that this duty of compliance with workplace safety regulations is nondelegable.[34]
The problem with this argument is that the employer permitting Henson to operate the forklift on the day in question was CMI, not Labor Ready.[35] CMI, not Labor Ready, therefore had the duty to ensure that Henson was properly certified.[36]
Brown raised no question of fact as to negligent hiring or retention or training.
*174 The trial court did not err in dismissing her direct negligence claims.
Affirmed.
COX, A.C.J., and KENNEDY, J., concur.
NOTES
[1] CR 56; Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 63-64, 1 P.3d 1167 (2000).
[2] RESTATEMENT (SECOND) OF AGENCY § 219 at 481 (1958); Stocker v. Shell Oil Co., 105 Wash.2d 546, 548, 716 P.2d 306 (1986).
[3] RCW 51.04.010.
[4] RCW 51.04.010; RCW 51.32.010.
[5] RCW 51.24.030(1); Marsland v. Bullitt Co., 71 Wash.2d 343, 346, 428 P.2d 586 (1967).
[6] Stocker, 105 Wash.2d at 548, 716 P.2d 306; see also Olson v. Veness, 105 Wash. 599, 601, 178 P. 822 (1919).
[7] See Nyman v. MacRae Bros. Const. Co., 69 Wash.2d 285, 285, 418 P.2d 253 (1966) (doctrine presents "Pandora's `package' for analysis").
[8] Fisher v. City of Seattle, 62 Wash.2d 800, 803, 384 P.2d 852 (1963).
[9] Stocker, 105 Wash.2d at 548, 716 P.2d 306.
[10] Fisher, 62 Wash.2d at 804, 384 P.2d 852.
[11] 62 Wash.2d 800, 384 P.2d 852 (1963).
[12] Fisher, 62 Wash.2d at 804-05, 384 P.2d 852.
[13] Fisher, 62 Wash.2d at 805, 384 P.2d 852.
[14] Novenson v. Spokane Culvert & Fabricating Co., 91 Wash.2d 550, 553, 588 P.2d 1174 (1979); see also Fisher, 62 Wash.2d at 804, 384 P.2d 852; Rideau v. Cort Furniture Rental, 110 Wash.App. 301, 303, 39 P.3d 1006 (2002).
[15] 91 Wash.2d 550, 553, 588 P.2d 1174 (1979).
[16] 69 Wash.2d 285, 418 P.2d 253 (1966).
[17] Nyman, 69 Wash.2d at 288, 418 P.2d 253 (quoting RESTATEMENT AGENCY (SECOND) § 227 (1958)).
[18] Nyman, 69 Wash.2d at 289, 418 P.2d 253.
[19] 63 Wash.2d 252, 257, 386 P.2d 958 (1963)
[20] Davis, 63 Wash.2d at 257, 386 P.2d 958.
[21] Davis, 63 Wash.2d at 257, 386 P.2d 958 (quoting Macale v. Lynch, 110 Wash. 444, 448, 188 P. 517 (1920)).
[22] Davis, 63 Wash.2d at 259, 386 P.2d 958.
[23] Clerk's Papers at 146. Labor Ready moved to strike this evidence as hearsay, but it was not offered to prove its content and therefore was not hearsay.
[24] See Fisher, 62 Wash.2d at 804, 384 P.2d 852; Davis, 63 Wash.2d at 257, 386 P.2d 958.
[25] Brown cites Labor Ready's agreement, signed by Henson, which states that Henson was Labor Ready's employee. The section titled "Release of Claims Against Labor Ready Customers" reads in relevant part: "In accepting any work assignment, I acknowledge that I am a temporary employee of the Company and am not an employee of the Company's customer." Clerk's Papers at 121. Henson waived any claims against Labor Ready's customers, and Labor Ready paid worker's compensation premiums for Henson.
[26] See, e.g., Rideau v. Cort Furniture Rental, 110 Wash.App. 301, 39 P.3d 1006 (2002).
[27] See, e.g., Novenson, 91 Wash.2d at 550, 588 P.2d 1174 (Kelly Labor employee injured at Spokane Culvert); Rideau, 110 Wash.App. at 301, 39 P.3d 1006 (temporary labor firm employee injured while performing duties at furniture company).
[28] Novenson, 91 Wash.2d at 555, 588 P.2d 1174.
[29] See RCW 51.04.010; 51.24.030(1).
[30] Questions regarding Henson's experience, training, and safety record in operating a forklift were not answered below, as Labor Ready indicated in responses to interrogatories that Henson's employment application could not be found, that personnel files are not kept on employees, and that Henson is a transient and cannot be located.
[31] Brown has abandoned her negligent supervision claim.
[32] RAP 2.5(a).
[33] See Betty Y v. Al-Hellou, 98 Wash.App. 146, 148-49, 988 P.2d 1031 (1999); Peck v. Siau, 65 Wash.App. 285, 292-93, 827 P.2d 1108 (1992).
[34] See Ward v. Ceco Corp., 40 Wash.App. 619, 628-29, 699 P.2d 814 (1985); see also State v. P.B.M.C. Inc., 114 Wash.2d 454, 463, 788 P.2d 545 (1990).
[35] See WAC 296-24-012(6) (defining employer).
[36] See WAC 296-24-23025 (employer must ensure forklift operator is competent as demonstrated by successful completion of training; before permitting employee to operate forklift, employer must ensure operator has completed training).