IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JAMES SALING, | ) | No. 80097-3-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | |
| GAITHER & SONS CONSTRUCTION, COMPANY, | ) ) ) | UNPUBLISHED OPINION |
| Respondent. | ) ) | FILED: September 16, 2019 |

SMITH, J. — When a defendant in a negligence action claims that it is the plaintiff's employer and therefore immune from liability under Washington's Industrial Insurance Act, Title 51 RCW, we must determine whether there was an employment relationship between the defendant and the plaintiff. An employment relationship exists only when the putative employer has the right to control the worker-plaintiff's physical conduct in the performance of his duties and there is consent by the worker to an employment relationship.

Here, James Saling was injured while working on a job site at which Gaither & Sons Construction Company (Gaither) was the general contractor. He argues that because he raised genuine issues of material fact as to whether Gaither was his employer, the trial court erred by summarily dismissing his negligence action against Gaither. Because genuine issues of material facts remain as to whether

Saling consented to an employment relationship with Gaither, we agree. Therefore, we reverse and remand for further proceedings.

BACKGROUND

On February 17, 2015, James Saling was injured while working at a construction site at which Gaither was the general contractor. Saling and his uncle, Daniel Pittman, had been assigned to work at the site by their employer, Labor Ready, a company that Gaither used to provide temporary workers. Labor Ready had notified Saling of the job the day before, and on the morning of February 17th, Saling and Pittman went to Labor Ready, received the job assignment, and then went to the job site.

After arriving at the job site, Saling asked for Kevin Billups, whose name was on the paperwork that Saling had. Billups asked if Saling and Pittman had protective equipment, which they did, and then "said he was going to get his lead or supervisor and then [Saling and Pittman] would be talking with him if [they] needed or he would give [Saling and Pittman] the details of [their] job." Billups then radioed Scott Zitterkopf, who walked Saling and Pittman to the building where they would be working. There, Zitterkopf explained to Saling and Pittman that they would be moving stacks of doors to door frames throughout the building. Zitterkopf marked the door frames where the doors would be going with an "X." Zitterkopf then left to attend to other matters. After Zitterkopf left, Saling and Pittman devised a plan for moving the doors and spent the next three hours or so moving doors from stacks on the second and third floors of the building. At about

2

10:30 or 11:30, Saling and Pittman found Zitterkopf at the main entrance to the building and spoke with him about taking a lunch, which Zitterkopf indicated was fine. Zitterkopf also briefly showed Saling and Pittman the next stack of doors that they would be moving from the first floor when they returned from lunch. When Saling and Pittman returned from lunch, they went back to work and resumed moving doors. Saling was injured when he attempted "to pull the bottom out just a little bit on the first door so we could move it." According to an accident report prepared by Billups, Saling was "moving doors from one location to another inside [building] when door stack fell over striking worker."

Saling applied for workers' compensation in connection with his injuries. The Washington Department of Labor and Industries (L&I) accepted his claim and assigned it to Labor Ready as Saling's employer. L&I expended a total of $16,372.68 on Saling's claim.

In March 2016, Saling filed a negligence action against Gaither. Gaither subsequently moved for summary judgment. Gaither argued that under Washington's Industrial Insurance Act, it was immune from common law liability to Saling because Gaither was Saling's "special employer." It also argued that in the employment terms and acknowledgements (ETA) that Saling signed in connection with this employment by Labor Ready, Saling entered into an enforceable agreement that Gaither was his special employer and that he would look to worker's compensation as his sole remedy for on-the-job injuries. Specifically, section 14 of the ETA provides:

3

> Release of Claims Against The Employer's Customers and
> Transitional (Light) Duty Work Agreement
>
> I understand that my employer provides temporary workers for its
> customers to work at the customers' project site. While working at
> the customer's job site, I agree and consent that the customer is my
> special employer ("Special Employer") and that the customer directs,
> controls and supervises my work. After I have been paid by my
> employer for work that I have performed, I hereby assign, transfer
> and convey any and all lien rights I may have to my employer for the
> work I have performed.
>
> Worker's Compensation shall be my sole remedy for on the job
> injuries.
>
> If I am ever injured in the course of my work I agree that I will elect,
> and solely rely upon TrueBlue's Workers' Compensation coverage
> for any recovery for such injuries, and not seek any recovery whether
> civil or through workers' compensation of any other party, including,
> but not limited to, a Special Employer. I further waive any claim I or
> my heirs and assigns may now have or that may later accrue against
> a Special Employer. I understand that I am not waiving or releasing
> any claims which I may have against TrueBlue's Workers'
> Compensation coverage.
>
> If I am ever inured in the course of my work for my employer, a
> transitional duty job will be made available for me. I understand that
> if I do not report for transitional duty work immediately, I may
> jeopardize my entitlement to Workers' Compensation wage
> replacement benefits.[1]

Saling countered that Gaither was not entitled to claim the benefit of the ETA

because Gaither was not a party to it. Saling also argued that the release

language in the ETA violated public policy as well as RCW 51.04.060, which

provides that "[n]o employer or worker shall exempt himself or herself from the

---

[1] (Boldface omitted) (emphasis added). The record does not reflect the relationship between Labor Ready and TrueBlue, but indicates that Labor Ready is "a TRUEBLUE company."

burden or waive the benefits of [the Act] by any contract, agreement, rule or regulation, and any such contract, agreement, rule or regulation shall be pro tanto void."

The trial court granted Gaither's motion for summary judgment. Although not incorporated into its written order, the trial court explained in its oral ruling that dismissal was warranted because Gaither was Saling's special employer. Saling appeals.

## ANALYSIS

Saling argues that the trial court erred by summarily dismissing his negligence action against Gaither. Because Saling raised a genuine issue of material fact as to whether Gaither was his special employer and consequently immune from common law negligence liability, we agree.

"We review summary judgment orders de novo, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate "if the pleadings, depositions . . . and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Summary judgment may be granted only when there is but one conclusion that could be reached by a reasonable person. Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979).

The Washington Industrial Insurance Act (the Act) abolished common law

causes of action for workplace injuries. RCW 51.04.010. In lieu of private suits, the Act provides for state-funded workers' compensation to injured workers. RCW 51.32.010; see also Seattle-First Nat'l Bank v. Shoreline Concrete Co., 91 Wn.2d 230, 242, 588 P.2d 1308 (1978) ("With certain specified exceptions, the Act abolishes . . . [a]ll civil actions for personal injuries arising between employees and the employers. In its place the State has provided employees with sure and certain relief regardless of the fault or due care of either the employer or employee."). The Act creates an exception, however, "permitting those workmen injured by the negligence of one 'not in the same employ' to elect to seek a remedy against the tort-feasor." Novenson v. Spokane Culvert & Fabricating Co., 91 Wn.2d 550, 552, 588 P.2d 1174 (1979); RCW 51.24.030(1). Thus, where a defendant in a common law negligence action claims immunity as an employer under the Act, we ask whether the plaintiff was an employee of the defendant within the context of the Act. To this end, the Act has been construed so as to "permit a worker to be concurrently the employee of a general employer and at the same time the employee of a special employer." Novenson, 91 Wn.2d at 552. Here, the issue is whether Gaither was a special employer of Saling.

Determining whether Gaither was Saling's special employer involves a two-pronged inquiry: "[A]n employment relationship exists only when: (1) the employer has the right to control the servant's physical conduct in the performance of his duties, and (2) there is consent by the employee to this relationship." Novenson, 91 Wn.2d at 553. Among those factors we may examine to determine control are

6

(1) who controls the work to be done; (2) who determines the qualifications; (3) setting pay and hours of work and issuing paychecks; (4) day-to-day supervision responsibilities; (5) providing work equipment; (6) directing what work is to be done; and (7) conducting safety training.

Bennerstrom v. Dep't of Labor & Indus., 120 Wn. App. 853, 863, 86 P.3d 826 (2004). Exclusive control for all purposes is not required; rather, the question is "the control of the borrowed servant by the borrowing employer for the transaction causing injury." Brown v. Labor Ready Nw., Inc., 113 Wn. App. 643, 651, 54 P.3d 166 (2002). As to consent, "[a] mutual agreement must exist between the employee and employer to establish an employee-employer relationship." Novenson, 91 Wn.2d at 553.

Here, and as further discussed below, we conclude that although summary judgment was proper on the issue of control, genuine issues of material fact remain as to consent. Therefore, reversal is required.

### *Control*

Saling argues that he raised a genuine issue of material fact as to the control prong of the special employer test. We disagree.

Brown is instructive. In Brown, Joyce Brown was an employee of CMI, a lumber distribution center. Brown, 113 Wn. App. at 645. Brown was injured when a bundle of lumber fell from a forklift onto her legs and then the forklift accelerated forward, pinning her between two bundles. Brown, 113 Wn. App. at 646. The forklift operator, Russell Henson, was employed by Labor Ready, which CMI customarily used as a source of temporary labor. Brown, 113 Wn. App. at 645. Brown sued

Labor Ready for negligence, alleging that it was vicariously liable for Henson's negligence. Brown, 113 Wn. App. at 646. After the trial court summarily dismissed Brown's claims, Brown appealed to this court. Brown, 113 Wn. App. at 646.

We explained that Labor Ready could not be vicariously liable for Henson's negligence if Henson was Brown's coworker, i.e., if Henson was also employed by CMI when the incident occurred. Brown, 113 Wn. App. at 647. And whether Henson was employed by CMI, for vicarious liability purposes,[2] depended solely on whether CMI had the right to control Henson. Brown, 113 Wn. App. at 650-51. We held that summary judgment was proper, observing that

> there [was] no indication that Henson took charge in the absence of CMI direction. To the contrary, Henson was performing his work at the CMI yard under the direction of CMI workers, and was operating a CMI forklift. CMI, and only CMI, had control over Henson at the jobsite. Each day, Henson reported to and had his timecards signed by CMI's yard supervisor, . . . who instructed Henson regarding his duties and monitored his work. CMI provided the equipment necessary to perform the job. Moreover, there was no Labor Ready employee on site to supervise the work of the dispatched temporary employees.

Brown, 113 Wn. App. at 652.

Here, as in Brown, Saling was performing work at Gaither's job site at the direction of Zitterkopf, a Gaither worker. And according to the testimony of Jordan Gaither, Gaither had primarily responsibility for safety at the site and did not give that responsibility to any other entity. To that end, the Labor Ready "Job Order

---

[2] In vicarious liability cases, proof of control only (and not consent) is required because the rights of the loaned employee are not at issue. Brown, 113 Wn. App. at 653. But their discussion of the control prong remains instructive.

Sheet" that was completed for Saling's task indicated that Gaither would provide all site- and task-specific protective equipment and training, if required. Furthermore, when Saling arrived at the job site, Saling reported to Billups, Gaither's site superintendent, who confirmed that Saling had the requisite protective equipment. And another Gaither worker, Zitterkopf, instructed Saling regarding his duties. Although Zitterkopf did not stay to actively monitor Saling and Pittman as they carried out his instructions, the record establishes that Zitterkopf had the right to direct and monitor their work: Zitterkopf marked with an "X" each door frame at which Saling and Pittman were to place doors, and Saling sought Zitterkopf's permission to take a lunch break. Finally, Saling points to no evidence that Labor Ready retained control of Saling after his arrival on Gaither's job site. For these reasons, Saling has not raised a genuine issue of material fact as to control.

Saling makes no attempt to distinguish Brown but argues that "[t]he only evidence in the record" on the issue of control "is that [Gaither]'s assistant superintendent showed [Saling] and Mr. Pittman where the doors were and where they were to be moved." But as discussed above, the record contains more than that. The record reflects that Gaither had primary responsibility for safety at the job site; that Gaither would provide site- and task-specific protective equipment and training, if required; and that Saling sought Zitterkopf's permission to go to lunch. Furthermore, Saling acknowledged in the ETA that the Labor Ready customer to whose project site he was sent would direct, control, and supervise

9

his work. This acknowledgement is further evidence that Gaither had the right to control Saling. Saling's argument is unpersuasive.

*Consent*

Saling argues that he raised a genuine issue of material fact as to whether he consented to an employment relationship with Gaither. We agree.

Recent Washington cases discussing the consent prong of the special employer test stem from our Supreme Court's decision in <u>Fisher v. City of Seattle</u>, 62 Wn.2d 800, 384 P.2d 852 (1963). In <u>Fisher</u>, a worker was hired by Standard Stations, Inc. and injured through the negligence of Western Operations, Inc., Standard Station's sister company. <u>Fisher</u>, 62 Wn.2d at 801. The worker sued Western Operations, and Western Operations claimed immunity under the Act. The trial court granted summary judgment in favor of Western Operations, reasoning that because Western Operations and Standard Stations were related companies, the injured worker was an employee of both companies. <u>Fisher</u>, 62 Wn.2d at 802. Our Supreme Court reversed, holding that, "in cases involving the issue whether under Washington's workmen's compensation laws there is an employer-employee relation, such a relation cannot exist without the consent of the workman." <u>Fisher</u>, 62 Wn.2d at 806. Because the injured worker was unaware that Western Operations and Standard Stations were related companies, consent to an employer-employee relationship did not exist. <u>Fisher</u>, 62 Wn.2d at 806.

In arriving at its holding, the <u>Fisher</u> court outlined a number of principles

10

with regard to the consent prong of the special employer test. It first distinguished workers' compensation cases from vicarious liability cases, in which control only—and not consent—is required to establish an employment relationship. Fisher, 52 Wn.2d at 804-05. It explained that "[t]he rules of vicarious liability . . . were used generally for the adjustment of rights between the master and a third party due to activities carried on by the servant." Fisher, 62 Wn.2d at 804. "Thus, it made no difference whether there was a mutual agreement, as to their respective status, between the 'master' and 'servant.'" Fisher, 62 Wn.2d at 804. But in the workers' compensation context, "'the rights to be adjusted are reciprocal rights between employer and employee.'" Fisher, 62 Wn.2d at 805 (quoting 1 LEX K. LARSON, WORKMEN'S COMPENSATION LAW § 47.10 (1952)). Consequently, "'[t]o thrust upon a worker an employee status to which he has never consented . . . might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common law damages.'" Fisher, 62 Wn.2d at 805 (quoting 1 LARSON § 47.10). Thus, the Fisher court explained, the focus of the consent inquiry is on the putative employee:

> Under workmen's compensation law, . . . the spotlight focuses on the employee, i.e., the servant, rather than on the employer, i.e., the master. The important question, here, is: Did the workman consent with the 'employer' to the status of 'employee'? Unlike the common law, compensation law demands that, in order to find an employer-employee relation, a mutual agreement must exist between the employer and employee.

Fisher, 62 Wn.2d at 804. It also quoted Justice Cardozo to emphasize the importance of the putative employee's subjective understanding of the

employment relationship:

> "We do not doubt that the same man may be in the general employment of one master and the special employment of another [Citations omitted.] But employment, like any other contract, presupposes understanding. The new relation cannot be thrust upon the servant without knowledge or consent. [Citations omitted.] <u>He must understand that he is submitting himself to the control of a new master. . . . Understanding may be inferred from circumstances, but understanding there must be.</u> Common-law rights and remedies are not lost by stumbling unawares into a new contractual relation.
> There can be no unwitting transfer from one service to another."

Fisher, 62 Wn.2d at 806 (emphasis added) (first and third alterations in original) (quoting Murray v. Union Ry. Co., 229 N.Y. 110, 127 N.E. 907 (N.Y. 1920)).

Sixteen years after it decided Fisher, our Supreme Court again discussed the consent prong of the special employer test in Novenson. In Novenson, the plaintiff-worker, Joseph Novenson, sought part-time employment through Kelly Labor of Northwest, Inc. Novenson, 91 Wn.2d at 551. Novenson signed the requisite forms at Kelly Labor and was dispatched to Spokane Culvert and Fabricating Company, a customer of Kelly Labor. Novenson, 91 Wn.2d at 551. The next day, Novenson was reassigned to Spokane Culvert at his request. Novenson, 91 Wn.2d at 551. On his third day of work at Spokane Culvert, Novenson's hands were crushed when they were drawn into the rollers of a culvert rolling machine. Novenson, 91 Wn.2d at 551. Novenson received workers' compensation benefits as a Kelly Labor employee and then brought a negligence action against Spokane Culvert. Novenson, 91 Wn.2d at 551-52. On Spokane Culvert's motion for summary judgment, the trial court dismissed Novenson's claims, concluding as a matter of law that Spokane Culvert was Novenson's

employer and thus immune from liability under the Act. Novenson, 91 Wn.2d at 552.

Our Supreme Court reversed, holding that issues of material fact remained as to whether Novenson consented to an employment relationship with Spokane Culvert. Novenson, 91 Wn.2d at 555. Citing Fisher, the Novenson court stressed the importance of a mutual agreement between the employee and the employer and explained that "[t]he trier of fact at trial is the one to draw any inferences *as to* Novenson's understanding and consent vis-a-vis an employment relationship with Spokane Culvert." Novenson, 91 Wn.2d at 553, 555 (emphasis added). In short, in both Fisher and Novenson, our Supreme Court stressed the importance of the putative employee's subjective understanding of the relationship in determining consent.

We applied the principles of Fisher and Novenson in Rideau v. Cort Furniture Rental, 110 Wn. App. 301, 39 P.3d 1006 (2002). In Rideau, the plaintiff, Garland Ray Rideau, was hired by Occupational Resource Management (ORM), a provider of temporary labor. Rideau, 110 Wn. App. at 302. ORM offered Rideau a temporary job with Cort Furniture Rental, and Rideau accepted the job. Rideau, 110 Wn. App. at 302. Cort supervised Rideau's work, and Rideau followed Cort's directions and expressed no concerns about Cort's supervision. Rideau, 110 Wn. App. at 303. "Nevertheless, Rideau stated that he did not believe Cort was his employer or that he was Cort's employee; he considered ORM to be his employer." Rideau, 110 Wn. App. at 303.

13

About six weeks after he was hired by ORM and while still a temporary worker with Cort, Rideau was injured when he was a passenger in a car driven by a permanent Cort employee. Rideau, 110 Wn. App. at 303. Rideau received workers' compensation benefits, and after his workers' compensation claim closed, Rideau sued Cort in negligence. Rideau, 110 Wn. App. at 303. The trial court summarily dismissed Rideau's claims, concluding that Cort had satisfied both the control and consent prongs of the special employer test. Rideau, 110 Wn. App. at 303.

We disagreed, holding that genuine issues of material fact remained as to "whether Rideau consented to the role of 'employee' to Cort and whether a mutual agreement existed." Rideau, 110 Wn. App. at 307-08. We reviewed Fisher and Novenson, observing that the Novenson court highlighted the public policy implications of the workers' compensation scheme:

> When the party asserting the existence of an implied employment relation is not an employee seeking statutory compensation, but an employer seeking a defense to a common-law suit, different social values are at stake. In the former situation, if an employment agreement is established, moderate statutory benefits are available to the injured worker; however, reaching such a conclusion in the second situation results in the destruction of valuable common-law rights to the injured workman.

Novenson, 91 Wn.2d at 554-55. We concluded that with regard to the consent prong of the special employer test, "there must be clear evidence of a *mutual agreement* between the employee and employer such that the employee has clearly consented to be the 'employee' of the 'employer.'" Rideau, 110 Wn. App. at 307. We also concluded that "[a]n employee's subjective belief as to the

existence of an employer-employee relationship is material to the issue of consent." Rideau, 110 Wn. App. at 307. We observed that although Rideau accepted a job with Cort from ORM, he also stated that he considered ORM to be his sole employer. Rideau, 110 Wn. App. at 307. "This fact alone[,]" we held, "raises the question of whether Rideau consented to the role of 'employee' to Cort and whether a mutual agreement existed." Rideau, 110 Wn. App. at 307-08. Therefore, summary judgment was inappropriate.

We hold here, as we did in Rideau, that summary judgment was inappropriate. Like the plaintiff in Rideau, Saling considered Labor Ready to be his sole employer. Specifically, Saling testified that he understood Labor Ready to be his employer and that "[a]t no time did I think I was an employee of Gaither . . . nor did I consent to be an employee of Gaither." Although Saling's subjective belief that he was not employed by Gaither does not conclusively negate an employment relationship, this evidence, when viewed in the light most favorable to Saling, raises a triable issue of fact as to whether Saling consented to a mutual employment relationship with Gaither. See Jackson v. Harvey, 72 Wn. App. 507, 519, 864 P.2d 975 (1994) ("A worker's bare assertion of belief that he or she worked for this or that employer does not establish an employment relationship.").

Furthermore, and although the focus of the consent inquiry is on the putative employee, "[a] mutual agreement must exist between the employee and employer to establish an employee-employer relationship." Novenson, 91 Wn.2d at 553. To that end, in Novenson, the court found it worth noting that the

contractual agreement between Kelly Labor and Spokane Culvert "mentions no contract between Novenson and Spokane Culvert." Novenson, 91 Wn.2d at 555. Here, the record contains no contractual agreement between Labor Ready and Gaither,[3] much less one that mentions an agreement between Gaither and Saling. Thus, here, as in Novenson, the absence of evidence of an agreement between Saling and Gaither also weighs against imputing consent as a matter of law. The trial court erred by granting summary judgment to Gaither.

Gaither argues that summary judgment was proper because Saling expressly agreed in the ETA that while working at a Labor Ready customer's job site, "I agree and consent that the customer is my special employer." It contends that Saling is barred by the parol evidence rule from introducing testimony contradicting the terms of the ETA. But the cases that Gaither cites in support of its argument are breach of contract cases.[4] This is not a breach of contract case, and Gaither points us to no authority holding that the parties' contractual characterization of their employment relationship conclusively determines whether

---

[3] The record contains a Labor Ready credit application completed by Gaither in 2012. It also contains an offer to supply temporary workers that appears to be a Labor Ready customer agreement. But the customer name on the agreement is "Cook Street Losts LLC," the agreement is signed only by the customer and not Labor Ready, and the effective date of the agreement is June 22, 2015 (i.e., after the date of Saling's injury).

[4] See Perry v. Continental Ins. Co., 178 Wash. 24, 33 P.2d 661 (1934) (breach of insurance policy); Martin v. Smith, 192 Wn. App. 527, 368 P.3d 227 (2016) (breach of express warranty); Max L. Wells Trust v. Grand Cent. Sauna and Hot Tub Co., 62 Wn. App. 593, 815 P.2d 284 (1991) (breach of lease); Turner v. Wexler, 14 Wn. App. 143, 538 P.2d 877 (1975) (breach of conditional sales agreement).

a putative employer is immune from liability under the Act.

Rather, our precedents suggest otherwise. For example, in Bennerstrom, we observed that a contract is an "important factor to consider in determining whether an employment relationship exists." Bennerstrom, 120 Wn. App. 853, 860, 86 P.3d 826 (2004) (emphasis added). And in the vicarious liability context, our Supreme Court has declined to conclude that the contractual classification of workers as independent contractors precludes an argument that the workers are employees. See Wilcox v. Baseshore, 187 Wn.2d 772, 786-87, 389 P.3d 531 (2017); cf. Massey v. Tube Art Display, Inc., 15 Wn. App. 782, 786, 551 P.2d 1387 (1976) (whether parties believed they were creating a master-servant relationship just one of several factors to be considered in determining whether a worker is a servant or an independent contractor). We are not persuaded that the ETA's characterization of Labor Ready's customers as Saling's "special employers" is determinative here.

Gaither next argues that the consent prong has been conclusively proven because Saling also agreed in the ETA that while working at a Labor Ready customer's job site, "the customer directs, controls, and supervises my work." But the consent required in this context is consent to a mutual employment relationship, not just consent to a relationship in which the borrowing employer has control over the worker's work. See Rideau, 110 Wn. App. at 307 ("With respect to consent, there must be clear evidence of a mutual agreement between the employee and employer such that the employee has clearly consented to be the

'employee' of the 'employer.'"). Therefore, the acknowledgment in the ETA does not establish consent as a matter of law. Gaither's argument is unpersuasive.

As final matters, we decline to address Saling's argument that because Gaither was not a party to the ETA, Gaither cannot claim the benefit of the ETA. On appeal, Saling raised this argument for the first time in his reply brief, and he expressly characterized Gaither as a third-party beneficiary to the ETA in his opening brief. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration."). Additionally, because we hold that genuine issues of material fact exist as to whether Gaither was Saling's special employer (and not a third party), we do not reach Saling's argument that the ETA's release language constitutes an unlawful waiver of Saling's right to pursue a negligence action against a third party. See Wash. State Farm Bureau Fed'n v. Gregoire, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) (declining to address additional issues on appeal when resolution of one issue effectively disposed of case.)

We reverse and remand for further proceedings.

_____

WE CONCUR:

_____                    _____